Blair ARNOLD and Thomas E. Allen and Suzan A.
Jernigan *v.* The Honorable John Dan KEMP, Circuit Judge
of the Independence Circuit Court, Sixteenth Judicial
District, State of Arkansas and Suzan A. Jernigan *v.* State
of Arkansas

CR 91-60                                    813 S.W.2d 770

Supreme Court of Arkansas
Opinion delivered July 15, 1991

*Tom Allen* and *Blair Arnold*, for appellant Suzan Jernigan.

*Tom Allen, Blair Arnold, John Norman Harkey* and *H. David Blair*, for appellants Blair Arnold and Thomas E. Allen.

*Jeff Rosenzweig* and *Ralph G. Brodie*, for amicus curiae American Bar Association, American Criminal Defense Lawyers, and Arkansas Trial Lawyers Ass'n.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Senior Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. This case involves the constitutionality of Ark. Code Ann. § 16-92-108 (1987), which relates to the legislative limitation of expenses and fees imposed upon court-appointed attorneys for indigent clients accused of crime. We find, under the circumstances of this case, the expense and fee "caps" contained in section 16-92-108 to be unconstitutional and that the contempt citation should be vacated. We remand to the trial court for proceedings consistent with this opinion.

On November 30, 1990, the appellant, Suzan Jernigan, was charged by information with the capital murder of her husband, J.B. Goff, and mother, Patricia L. Dunn. Jernigan was determined to be indigent, and the appellants, Blair Arnold and

Thomas Allen, were appointed as her attorneys by the court on December 11, 1990. Both Messrs. Arnold and Allen objected to their appointments; however, they represented Jernigan during her arraignment. Trial date was subsequently set for April 1, 1991.

On March 14, 1991, Messrs. Arnold and Allen advised the trial court that they were refusing to proceed because they could not provide Jernigan with effective assistance of counsel as they were reluctant to incur overhead expenses while representing her, particularly in light of the fact that the trial court had refused to reimburse them for their out-of-pocket expenses or provide attorney's fees and had refused to supply Jernigan with funds with which to hire the necessary expert and investigatory assistance. Counsel were found to be in contempt of court, fined $1,000.00, and ordered to appear before the court on March 29, 1991, for further proceedings.

The appellants filed a notice of appeal, as well as a petition for a temporary writ of prohibition and permanent writs of prohibition, mandamus, and certiorari.

In *Ellis* v. *State*, 302 Ark. 597, 791 S.W.2d 370 (1990), we noted that appealability is controlled by Ark. R. App. P. 2(a), which requires a final judgment or decree or one that, in effect, determines the action and prevents a judgment from which an appeal might be taken or discontinues the action. Jernigan's appeal is premature as there has been no final, appealable order for this court to review. Her petitions for other relief are also inappropriate at this juncture and will not be considered.

We do, however, address the following arguments promulgated by Messrs. Arnold and Allen as an appeal from their contempt charge predicated upon their refusal to proceed as Jernigan's court-appointed counsel: 1) the fee and expense limitations contained in section 16-92-108 violate their right to due process and just compensation, and 2) the present system of appointing attorneys in the State of Arkansas violates their right to equal protection.

Messrs. Arnold and Allen also assert 3) that the limitation of expenses and attorneys' fees creates an inherent conflict of interest between the indigent and the court-appointed attorney,

and 4) that the limitation of expenses and fees by the General Assembly inherently, and in its application, invades the judicial branch of state government. In light of our analysis of the first two arguments, we need not address the latter two points on appeal.

## I. DUE PROCESS AND JUST COMPENSATION

Messrs. Arnold and Allen initially argue that section 16-92-108 violates their right to due process and just compensation.

We have held that there is a strong presumption of constitutionality attendant to every legislative enactment, and all doubt concerning it must be resolved in favor of constitutionality; if it is possible for the courts to so construe an act that it will meet the test of constitutionality, we not only may, but should and will do so. Further, the party challenging a statute has the burden of proving it unconstitutional. *Holland v. Willis*, 293 Ark. 518, 739 S.W.2d 529 (1987).

We have previously addressed the constitutionality of Ark. Stat. Ann. § 43-2419 (Repl. 1977) (currently section 16-92-108) in *State v. Ruiz*, 269 Ark. 331, 602 S.W.2d 625 (1980), where the State appealed from a circuit court decision awarding reasonable attorneys' fees to attorneys representing indigent criminal defendants and holding the statute limiting such payments to be unconstitutional. In that case, we held that the statute limiting payments to attorneys representing criminal defendants to $100 for investigation expenses and $350 for attorneys' fees did not violate the provision in the Arkansas Constitution providing for the separation of powers, and the trial court was bound by the statute.

At that time, we based our decision on a quick and short reference to the historical practice of attorneys representing indigents for little or no fee and on the professional oath an attorney swears to upon admittance to the Arkansas Bar, which oath reads in pertinent part as follows:

> I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, or delay any man's cause for lucre or malice. SO HELP ME GOD.

We also stated in *obiter dictum*:

> It has been argued in another case that requiring an

> attorney to furnish services for little or no fee is a taking of property in violation of the due process clause of the United States Constitution. This argument was rejected in the case of *United States* v. *Dillon*, 346 F.2d 633 (9th Cir. 1965), *cert. denied*, 382 U.S. 978 (1966). Finding no common law or statutory or constitutional authority establishing payment of attorneys fees, we are left only the sources provided by the legislature. The only other source is the services being furnished by the attorneys themselves. Lawyers clearly have an obligation to represent indigents upon court orders and to do so for existing statutory compensation or for no remuneration at all.

(Citation omitted.)

Subsequent to our decision in *State* v. *Ruiz, supra,* other states have addressed the constitutionality of comparable fee cap statutes and found them to be unconstitutional. *DeLisio* v. *Alaska Superior Court*, 740 P.2d 437 (Alaska 1987); *State ex rel. Stephan* v. *Smith*, 242 Kan. 336, 747 P.2d 816 (1987); and *Makemson* v. *Martin County*, 491 So.2d 1109 (Fla. 1986).

In *Coulter* v. *State*, 304 Ark. 527, 804 S.W.2d 348 (1991), we were presented with the issues that we now address but were unable to directly analyze at that time because the defendant in that case had neither shown nor argued that he had suffered any specific prejudice resulting from the fee cap statute. *See Goldsmith* v. *State*, 301 Ark. 107, 782 S.W.2d 361 (1990); *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984). We noted, however, our concern and gave notice that we would reconsider our earlier decisions on the issue in an appropriate case and even outlined pertinent cases from other jurisdictions and their rationale that have dealt with the question. *Coulter* v. *State*, 304 at 542, 804 at 356; *see also Pickens* v. *State*, 301 Ark. 244, 783 S.W.2d 341 (1990). Rather than discuss these cases again, we single out and attach primary significance to *State ex rel. Stephan* v. *Smith, supra,* as the Supreme Court of Kansas commented at length upon the historical argument of legal representation for little or no fee:

> . . . the tradition of requiring pro bono work of attorneys originated in common-law England where attorneys who were expected to provide such representation also enjoyed

special rights and privileges. They were the sergeants-at-law, the elite among all English lawyers. They had special practice privileges, they commanded higher fees, and judges were selected exclusively from their ranks. They were actually public officers and were sometimes paid by the government. As officers of the court, English lawyers were exempt from suit, military service, and other compelled public service. Their modern American counterparts enjoy no such special privileges. The distinction and its consequences were recognized by the Indiana Supreme Court as early as 1854 [in *Webb* v. *Baird*, 6 Ind. 13, 17 (1854)]:

> The legal profession having been thus properly stripped of all its odious distinctions and peculiar emoluments, the public can no longer justly demand of that class of citizens any gratuitous services which would not be demandable of every other class. To the attorney, his profession is his means of livelihood. His legal knowledge is his capital stock. His professional services are no more at the mercy of the public, as to remuneration, than are the goods of the merchant, or the crops of the farmer, or the wares of the mechanic. The law which requires gratuitous services from a particular class, in effect imposes a tax to that extent upon such class — clearly in violation of the fundamental law, which provides for a uniform and equal rate of assessment and taxation upon all the citizens.

(Citations omitted.)

The court in *Webb* noted that an attorney is under no obligation, honorary or otherwise, to volunteer his services; it devolves as much on any other citizen of equal wealth to employ counsel in the defense as on the attorney to render services gratuitously.

The Kansas court concluded that:

> Attorneys generally have an *ethical* obligation to provide pro bono services for indigents. Such services may only be provided by attorneys. The individual attorney has a right to make a living. Indigent defendants, on the other hand, have the right to the effective assistance of counsel. The

obligation to provide counsel for indigent defendants is that of the State, not of the individual attorney. The adjustment of these rights and obligations presents the primary difficulty of the present statutory system. The burden must be shared equally by those similarly situated. In the final analysis, it is a matter of reasonableness.

Following its historical analysis, the court analyzed the fifth amendment issue before them as follows:

Whether a violation of due process has occurred depends upon whether "property" has been taken and upon what kind of "process" is due. . . . An attorney's advice and counsel is indeed his or her stock in trade. Moreover, when attorneys are required to donate funds out-of-pocket to subsidize a defense, they are deprived of property in the form of money. . . .

The term due process refers primarily to the methods by which the law is enforced; however the term has no fixed technical concept unrelated to time, place and circumstances. In *Hannah* v. *Larche*, 363 U.S. 420 (1960), this comment was made:

" ' "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding are all considerations which must be taken into account.' " *Smith* v. *Miller*, 213 Kan. 1, 514 P.2d 377 (1973).

Pertinent provisions of our constitution are subject to the same analysis. Article 2, § 22 of the Arkansas Constitution provides that private property may not be appropriated for public use without just compensation. *Johnson* v. *Wylie*, 284 Ark. 76, 679 S.W.2d 198 (1984); *see also* U.S. Const. amend. V ("No person shall . . . be deprived of property, without due process of law; nor shall private property be taken for public use, without just compensation.")

Focusing further on the rulings of the Kansas Court, we cannot escape the clear logic underlying their finding that although their statute, on its face, did not violate due process yet, when applied to the facts before them, the fee and expense cap limits were unconstitutional. The Kansas fee and expense cap limitations are comparable to limitations we face in section 16-92-108. The Kansas Court aptly noted:

> Attorneys, like the members of any other profession, have for sale to the public an intangible — their time, advice, and counsel. Architects, engineers, physicians, and attorneys ordinarily purvey little or nothing which is tangible. It is their learned and reflective thought, their recommendations, suggestions, directions, plans, diagnoses, and advice that is of value to the persons they serve. It is not the price of the paper on which is written the plan for a building or a bridge, the prescription for medication, or the will, contract, or pleading which is of substantial value to the client; it is the professional knowledge which goes into the practice of the profession which is valuable.

> Attorneys are licensed by the state to practice their profession; but so are other professionals, such as architects, engineers, and physicians. One who practices his profession has a property interest in that pursuit which may not be taken from him or her at the whim of the government without due process. . . .

> Attorneys make their living through their services. Their services are the means of their livelihood. We do not expect architects to design public buildings, engineers to design highways, dikes, and bridges, or physicians to treat the indigent without compensation. When attorneys' services are conscripted for the public good, such a taking is akin to the taking of food or clothing from a merchant or the taking of services from any other professional for the public good. And certainly when attorneys are required to donate funds out-of-pocket to subsidize a defense for an indigent defendant, the attorneys are deprived of property in the form of money. *We conclude that attorneys' services are property, and are thus subject to Fifth Amendment protection.* [Emphasis added.]

When the attorney is required to advance expense funds out-of-pocket for an indigent, without full reimbursement, the system violates the Fifth Amendment. Similarly, when an attorney is required to spend an unreasonable amount of time on indigent appointments so that there is genuine and substantial interference with his or her private practice, the system violates the Fifth Amendment.

*State ex rel. Stephan* v. *Smith*, 242 Kan. at 369, 747 P.2d at 841.

■ Like the question before the Kansas court, the core question before us is whether the services of an attorney are a species of property subject to Fifth Amendment protection. The answer is yes.

Unfortunately, we have perpetuated, throughout the years, a system of appointment without just compensation in many instances that is long past due for correction. The only proper and permissible course for us to follow is simply to give effect to the plain language of our constitution. *City of Hot Springs* v. *Creviston*, 288 Ark. 286, 705 S.W.2d 415 (1986). In doing so, we declare that even if the rationale in *State* v. *Ruiz*, *supra*, was correct when it was decided, and we have strong reservations in this regard, the practice of criminal law has changed, as have the times. Arkansas has delayed in confronting the realities of contemporary criminal defense practice, particularly in the area of capital litigation, even as the concept of what constitutes due process has changed. New scientific developments and an increased awareness in areas of social consciousness have served to drastically raise the complexity of criminal litigation. As a result, our trial courts must appoint highly trained and skilled counsel if indigents are to be afforded their constitutionally mandated effective assistance of counsel.

In *Family Div. Trial Lawyers* v. *Moultrie*, 725 F.2d 695 (D.C. Cir. 1984), the court noted:

As the scope of the constitutionally mandated right to counsel has expanded and the concomitant burden of providing *pro bono* representation imposed on attorneys has grown, several state courts have recognized that at some point the burden on particular attorneys could

become so excessive that it might rise to the level of a "taking" of property. *See, e.g., People ex rel. Conn.* v. *Randolph*, 35 Ill.2d 24, 219 N.E.2d 337 (1966); *Bias* v. *State*, 568 P.2d 1269 (Okla. 1977); *State ex rel. Partain* v. *Oakley*, 227 S.E.2d 314 (W.Va. 1976); . . .

■ In this case, the burden imposed on Messrs. Arnold and Allen is excessive to the extent that it constitutes a "taking" of their property and to limit them to a mere award of $1,000.00 for their work and skills is constitutionally unacceptable.

## II. EQUAL PROTECTION

Messrs. Arnold and Allen also argue that the present system of appointing attorneys in this state violates their right to equal protection. We agree.

In determining whether a classification denies the equal protection of the laws, we, as an appellate court, must determine if it has a rational basis and is reasonably related to the purpose of the statute; a classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced shall be treated alike. The factors we look at to determine whether a law is violative of equal protection are: 1) the character of the classification, 2) the individual interests asserted in support of the classification, and 3) the governmental interests asserted in support of the classification. *Holland* v. *Willis, supra.*

Messrs. Arnold and Allen contend that lawyers, as a class, are given less protection than other classes of professional citizens inasmuch as they are required to financially subsidize the State's responsibility of indigent representation.

Under our present system of indigent representation, we note that 26 counties have exercised their ability under legislative authority to initiate a public defender system, and 49 counties continue to utilize the traditional system of attorney appointment. Thus, an attorney's geographic location will initially determine whether his services will be commandeered for the public good or whether the public will fund the defense through its authorized legislative system. *See* Ark. Code Ann. §§ 16-87-

101 to -110 (1987). Additionally, in those counties that continue to appoint attorneys, an attorney's substantive area of practice and expertise will further define his eligibility for appointment. Consequently, our system of indigent representation is predicated upon an unequal distribution of the public's obligation to a subclass of attorneys based on where an attorney lives and on an attorney's ability to provide effective assistance of counsel.

The State responds by pointing out that only lawyers have the requisite license to practice law, and the legislature may take one step at a time when addressing complex problems. *See Bowen v. Owens*, 476 U.S. 340, 347 (1986) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)).

■ However, these arguments are not answers to the problem. Even though the legislature may take "one step at a time" in addressing complex problems, it does not have license to infringe upon the guaranteed constitutional rights of the citizens it represents. The untoward effects of the cap limitations fall unequally upon a select few lawyers, who serve under appointment, and result in a violation of lawyers' rights to equal protection.

■ Given these divergent positions and competing interests, we cannot say that the classifications have a rational basis or are reasonably related to the purpose of the statute. Again, we must find that section 16-92-108 does not pass constitutional muster as applied.

## ATTORNEYS' FEES AND COSTS

Inasmuch as we have declared an attorney's services to be his property, the taking of which is subject to just compensation, it necessarily follows that we look to section 16-92-108 to determine whether or not the fees that are "capped" at $1,000.00 in this case will reasonably compensate them for services rendered or to be rendered. The answer is obvious. This limitation for such serious, complex criminal litigation is wholly inadequate. As a result, it becomes our duty to assess an appropriate measure of compensation for the taking of these attorneys' property.

■■ In awarding fees to Messrs. Arnold and Allen for reasonably expended services, we do not mean that the trial court must simply award fees based on their customary hourly charges

or fixed fees for services in criminal cases of this nature. To the contrary, the trial court should determine fees that are considered "just." In *Chrisco* v. *Sun. Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990), we recognized various factors to be considered by a trial court in making its decision, on an award of attorneys' fees, including the experience and ability of the attorney, the time and labor required to perform the legal service properly, the novelty and difficulty of the issues involved, the fee customarily charged in the locality for similar legal services, the time limitations imposed upon the client's defense or by the circumstances, and the likelihood, if apparent to the court, that the acceptance of the particular employment will preclude other employment by the lawyer.

Ironically, the criterion we announced in *Chrisco* v. *Sun, supra,* is well grounded in express declarations of the Arkansas General Assembly as to appropriate payment for court-appointed counsel in criminal cases. In Act 125 of 1971, the Arkansas General Assembly expressed its concern about compensating counsel by enacting its second piece of legislation pertaining to indigents and court-appointed attorneys, in which it stated: ". . . *It is essential that counsel be furnished to him [the indigent] and that said counsel be compensated for his time, out of pocket expenses and services.*" Additionally, even though section 16-92-108 establishes a fee cap of $1,000.00 in the defense of a capital murder charge, the General Assembly declared that:

> (a)   Whenever legal counsel is appointed by any court of this state to represent indigent persons accused of crimes, whether misdemeanors or felonies, the court shall determine the amount of the fee to be paid the attorney and *an amount for a reasonable and adequate investigation of the charges* made against the indigent and shall issue an order for the payment thereof.
>
> \*         \*         \*         \*
>
> (b)(3)   *The attorney's fees provided for by this section shall be based upon the experience of the attorney and the time and effort devoted by him in the preparation and trial of the indigent, commensurate with fees paid other attorneys in the community for similar services.*"

(Emphasis added.)

The factors as enumerated in *Chrisco* v. *Sun, supra,* and as expressed by our General Assembly, are instructive and should be conservatively applied here.

■ Further, the statutory limitation of expenses, in the sum of $100.00, does not provide the necessary funds for Jernigan's defense, and, here again, it would constitute a taking to force Messrs. Arnold and Allen to finance these expenses out of their own pockets in order to provide her effective assistance of counsel. We do not suggest that the trial court give carte blanche authority to counsel to incur expenses, but rather it should be within the province of the sound judgment of the trial court to approve such reasonable expenses as are plainly necessary for the defendant to have her day in court and to permit counsel to fairly and adequately present her case.

We reverse and remand to the trial court with directions to vacate its finding of contempt on the part of Messrs. Arnold and Allen and for further proceedings consistent with this opinion.

DUDLEY, HAYS, NEWBERN, and GLAZE, JJ., concur.

ROBERT H. DUDLEY, Justice, concurring. I agree with the majority opinion's holding that the statute setting a limit of $1,000.00 on attorney's fees and a limit of $100.00 on investigation expenses for the defense of a capital murder case is unconstitutional as applied in this case. I concur in holding that the statute, as applied, violates the Equal Protection Clause of the fourteenth amendment. Consequently, I agree that the judgment of criminal contempt entered against attorneys Arnold and Allen must be remanded. However, I am unable to agree that the attorneys' right to due process has been violated and that the attorneys are entitled to "just compensation" because their property has been unconstitutionally taken. The distinction is significant.

### 1. Due Process

In 1876, we held that attorneys may be required to represent indigent defendants without pay:

> Attorneys are a privileged class; they are only permitted to practice in the courts; and they are officers of the

court. The law confers on them rights and privileges, and with them imposes duties and obligations to be reciprocally enjoyed and performed. The services required of them, in cases like the present, are such as charity and humanity demand in behalf of the destitute and defenseless; and the presumption cannot be admitted that they serve in expectation of fee or reward. The appellees but performed a duty, which their relation to the court and the public required of them.

*Arkansas County* v. *Freeman & Johnson*, 31 Ark. 266 (1876).

That concept has been followed through the years and, in *State* v. *Ruiz*, 269 Ark. 331, 602 S.W.2d 65 (1980), we wrote:

It has been argued in another case that requiring an attorney to furnish services for little or no fee is a taking of property in violation of the due process clause of the United States Constitution. This argument was rejected in the case of *United States* v. *Dillon*, 246 F.2d 633 (9th Cir. 1965) *cert. denied*, 382 U.S. 978 (1966). Finding no common law or statutory or constitutional authority establishing payment of attorney's fees, we are left only with the sources provided by the legislature. The only other source is the services being furnished by the attorneys themselves. Lawyers clearly have an obligation to represent indigents upon court orders and to do so for existing statutory compensation or for no remuneration at all.

In *Shelton* v. *State*, 287 Ark. 322, 699 S.W.2d 728 (1985), we wrote:

Appellant argues the court erred in denying three motions for funds. He first submits that Ark. Stat. Ann. § 43-2419, which authorizes and limits the amount of funds for payment of defense counsel and investigation services for indigent defendants, is so inadequate as to be unconstitutional. We considered this issue in *State* v. *Ruiz & Van Denton*, 269 Ark. 331, 602 S.W.2d 625 (1980), and upheld its constitutionality. Although we expressed concern that the statute does not allow for adequate compensation in some cases, we said the remedy must remain in the province of the legislature.

In sum, we have long required lawyers to perform this duty as a form of public service.

Compelling an individual to perform special types of public services does not constitute an imposition of involuntary service. *See Hurtado* v. *United States*, 410 U.S. 578 n. 11 (1973) (requirement that prisoners serve as witnesses in a trial without compensation constitutes public duty); *Bertelson* v. *Coney*, 213 F.2d 275, 277-8, *cert. denied*, 348 U.S. 856 (1954) (special draft of medical personnel); *Selective Draft Law Cases*, 245 U.S. 366, 390 (1918) (military draft); *Butler* v. *Perry*, 240 U.S. 328, 333 (1916) (work on public roads). In order to meet some special needs, a government must have the ability to compel special forms of public service. The only real issue is whether the government must pay "just compensation" for those public services.

The vast majority of state and federal courts which have addressed the due process issue have decided that requiring counsel to serve without compensation is not an unconstitutional taking of property without just compensation. See *Williamson* v. *Vardeman*, 674 F.2d 1211 (8th Cir. 1982) for a listing of cases. A minority of courts have relaxed this obligation by reasoning that, although requiring an attorney to accept uncompensated cases as a condition of practicing law does not normally violate due process, the level of appointments may be so great that they constitute a "taking" when the attorney is no longer able to engage in remunerative practice. *State ex rel. Stephan* v. *Smith*, 242 Kan. 336, 747 P.2d 816 (1987); *DeLisio* v. *Alaska Superior Court*, 740 P.2d 437 (Alaska 1987); and see *Family Div. Trial Lawyers* v. *Moultrie*, 725 F.2d 695 (1984) for a listing of other cases.

The source of the special duty is a lawyer's status as an officer of the court. As stated in *United States* v. *Dillon*, 346 F.2d 633, 635 (9th Cir. 1965), *cert. denied*, 382 U.S. 978 (1966):

> An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order. Thus, the lawyer has consented to, and

assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a "taking of his services." Cf. *Kunhardt & Company, Inc.* v. *United States*, 266 U.S. 537, 45 S.Ct. 158, 69 L.Ed. 428 (1925).

In *Powell* v. *State of Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court held, in a capital case where the defendant was unable to employ counsel and was incapable of making his own defense adequately because of ignorance, etc., that it was the duty of the court to assign counsel for him, and stated at page 73, 53 S.Ct. page 65: "Attorneys are officers of the court, and are bound to render service when required by such an appointment."

In sum, I would follow our long tradition and our past cases and would agree with the vast majority of courts and hold that there has not been a taking of the attorneys' property.

However, the majority opinion holds that attorneys' services are property subject to fifth amendment protection, and that there has been an unconstitutional taking of that property. The fifth amendment, in the material part, provides, "nor shall private property be taken for public use, without *just compensation.*" (Emphasis added.) "Just compensation" means that the owner of the property appropriated is entitled to receive the fair value of the property taken, but, no more, because to award him less would be unjust to him, and to award him more would be unreasonable to the public. *Bauman* v. *Ross*, 167 U.S. 548 (1897). We have said "just compensation" means "full compensation." *Arkansas State Hwy. Comm'n* v. *Stupenti*, 222 Ark. 9, 257 S.W.2d 37 (1953). Thus, a lawyer who regularly earns $150.00 per hour from paying clients must be paid by the State at that same rate for representing an indigent defendant. The majority opinion states otherwise, and, as its basis, cites one of our cases and an Arkansas statute. The case does not deal with "just compensation" under the fifth amendment. The statute is the one overruled as applied in this case. More importantly, ultimately state law is not going to control the federal issue of just compensation under the fifth amendment to the Constitution of the United States. No state limit, even a reasonable one, can be placed on the amount of just compensation due under the fifth amendment. For all practical

purposes, the judiciary will have usurped the legislature's power over appropriations, and the courts will be authorized to order large sums of unappropriated money to be paid to attorneys. It is conceivable that county, and perhaps state, financial crises will result.

The legal precedent set by the majority opinion may possibly lead to a ruinous level of court costs and fees. If lawyers' time cannot be taken without just compensation in criminal cases, it cannot be taken in civil cases. Juvenile proceedings which require attorneys ad litem may be the next area contested. If lawyers' time cannot be taken without just compensation, witnesses' time cannot be taken without just compensation. Suppose the president of a large corporation earns $1,000.00 per hour and witnesses a minor car wreck. Could the parties to the car wreck afford to have their dispute decided in a court if one witness's fee amounts to $1,000.00 per hour? Perhaps this concept, which ignores the duty to perform certain public services, can be most clearly demonstrated by stating that, followed to its logical conclusion, it would mean if a person were making $100,000 per year and were drafted into the Army as a private, he would be entitled to receive $100,000 per year for his military service. In sum, I would join the vast majority of state and federal courts and hold that requiring counsel to serve poor people in criminal cases without compensation is not an unconstitutional taking of property. Therefore, counsel is not entitled to "just compensation."

## 2. Equal Protection

However, I concur in holding that the statutes placing unreasonable limits on fees and expenses violate the Equal Protection Clause of the fourteenth amendment. The practical, but significant, difference is that under an equal protection holding the State could place a reasonable limit on attorneys' fees.

As set out in the majority opinion a statute will be upheld if it bears a "*fair* and substantial relationship to a legitimate State end." *See Michael M.* v. *Superior Court of Sonoma County*, 450 U.S. 464 (1981). The factors used to determine fairness are: (1) the character of the classification, (2) the individual interests asserted, and (3) the governmental interests asserted. *Holland* v. *Willis*, 293 Ark. 518, 739 S.W.2d 529 (1987). In this case the

indigent defendant has the right, under federal and state law, to the effective assistance of counsel. The obligation to provide that counsel is the State's. Without question, a statute providing for fees to indigent defendants is related to a legitimate State end.

The State has adopted a statutory scheme by which it has delegated its obligation to the various counties. The counties may set up a public defender system or may pay individual attorneys to defend indigents, but when individual attorneys are appointed, the limit of the county's liability is $1,000.00. As the majority opinion points out, individual attorneys are appointed in forty-nine (49) of the seventy-five (75) counties in the State. In Independence County, where this case arose, one of the attorneys appointed has now been appointed to defend five murder cases, four of them capital murder cases, since 1978, his year of admission to the bar. He has been forced to expend 200 to 500 hours defending each case. His office overhead currently amounts to $23.92 per hour. He estimates this case will take 300 to 500 hours of his time. If he spends 300 hours on this case, his overhead costs will be over $7,000.00. After deducting the $1,000.00 fee, the result will be an out-of-pocket loss of over $6,000.00 on office overhead alone. This does not include his loss of time. He customarily bills at the rate of $90.00 to $100.00 per hour. Obviously, $90.00 times 300 hours would amount to $27,000.00. All together, he will likely suffer a financial loss well in excess of $25,000.00, and this is the fifth time in thirteen (13) years he has been appointed to defend a murder case.

Other attorneys testified that, if the accused in this case could pay a fee, they would charge fees of $50,000 to $80,000. There can be no real question but that the proof in this case shows that the attorneys appointed will suffer a substantial personal financial loss.

The State has a legitimate interest in supplying counsel to an indigent defendant who is charged with capital murder. The only issue is whether the State has met that obligation in a way which does not *unfairly* discriminate against these attorneys. As set out, the test of fairness has three (3) criteria. First, the character of classification. The statute passes this test. It has a rational basis. Lawyers may be singled out as a class to defend indigents at less than "just compensation." Second, and the only real issue, is

whether the class singled out is fairly treated. This necessitates a weighing of the lawyer's ethical duty to defend indigents against their ability to financially maintain themselves and their families. The ethical obligation will justify paying them a reduced fee for providing legal services to poor people, but the statute now before us pays far less than a "reduced fee." In fact, as applied in this case, it mandates a real and substantial financial loss to these attorneys. The statutory fee limitation, as applied in this case, is so low that it is patently unfair. It does not amount to a fair balancing of the attorneys' ethical duty with their financial interests. Thus, the statute, as applied in this case, denies these attorneys their right to equal protection.

### 3. Conclusion

I concur in holding that the statute as applied violates the Equal Protection Clause of the fourteenth amendment, but I do not agree with the majority that the attorneys' right to due process has been violated. The practical difference is that I would uphold a *reasonable* statutory limitation on fees, while the majority opinion authorizes "just compensation."

DAVID NEWBERN, Justice, concurring. Time changes everything. In the first of the "Scottsboro cases," *Powell* v. *Alabama*, 287 U.S. 45 (1932), the Supreme Court held there were some circumstances in which the Due Process Clause of the Fourteenth Amendment entitled an indigent defendant to the right of counsel. In 1942, there were still "circumstances" in which an indigent defendant charged with rape and murder was said to have no right to counsel to assist in his defense. *Betts* v. *Brady*, 316 U.S. 455 (1942). The horn could be heard in the distance, however, and in *Gideon* v. *Wainwright*, 372 U.S. 335 (1963), it became loud and clear that the Fourteenth Amendment required the states to observe that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. 6.

It was about the time of *Gideon* v. *Wainwright* that Atticus Finch was defending Tom Robinson, without mention of a fee, perpetuating in the eyes of readers everywhere the noble image of the lawyer dedicated to justice with no thought of the "lucre" we mentioned in *State* v. *Ruiz*, 269 Ark. 331, 602 S.W.2d 65 (1980).

But things were changing still. Criminal defense work became more complicated due to the pervasiveness and growth of the sciences of detection and the salutary and growing recognition of the need for fair play in safeguarding the rights of accused persons.

Justice Dudley's thoughtful rejection of the due process rationale of the majority opinion, has given me pause. How can it be a "taking" of a lawyer's property to ask the lawyer to do that which the lawyer is already sworn to do? I believe the answer lies in the set of changes mentioned above affecting the trial of criminal cases and the concurrent changes in the legal profession which have resulted in a degree of specialization.

The law is an activity not only steeped in precedent but "bound" by it, or at least weighted by it in the process of social, and the slowly following legal, evolution. It is easy for those engaged in the profession to add nostalgia to precedent and hope we will not have to alter the way we do things. If the burden of representing indigent criminal defendants were shared by all lawyers, perhaps (although not to a true purist) it would be too little to amount to a taking. The truth is that serious criminal cases demand experienced criminal lawyers in order that justice be done. I do not deny that there are still lawyers who can "do it all," but more and more we see instances where good lawyers, for good reasons often having to do with protection of their would-be clients, do not wish to be put in the impossible position of having to deal with matters foreign to their experience. We see good criminal defense lawyers, relatively few in number, being called upon time and again to the point of exhaustion of themselves, to say nothing of exhaustion of the laudable sentiment and purpose of the lawyer's oath. I tend to agree there is an Equal Protection Clause problem in addition to the Due Process Clause prohibition against a taking without just compensation.

It seems inevitable that the concern Justice Dudley points up about the possible burden of expense this decision will place on the counties will be addressed by creation of a statewide public defender system. I hope it may also stimulate consideration of resurrecting the appellate public defender program we had in Arkansas in the late 1970s. Lawyers who wish to engage in private criminal law practice will still be able to do so, and good

criminal lawyers who are not public defenders may remain available to be appointed for criminal defense work without fee if they choose. Indigent defendants may in some, probably rare, instances have the assistance of counsel of their choice. At any rate they will be assured of counsel from an office devoted solely to the task of assisting them expertly. The resources available to the State for prosecution will be balanced by the resources available to the defense, and our system of justice will be fairer than it has been.

TOM GLAZE, Justice, concurring. I concur with the majority's decision to reverse the trial court's finding appellants in contempt. The majority relies heavily upon the case of *State ex rel. Stephan* v. *Smith*, 242 Kan. 336, 747 P.2d 816 (1987) in holding our law, Ark. Code Ann. § 16-92-108 (1987), unconstitutional. I believe it is important to discuss the rationale in *Stephan* in detail, particularly as it relates what measure of compensation must be paid an attorney so as to avoid the due process issue and "taking" existent in this case.

In *Stephan*, the court considered a number of constitutional arguments challenging the constitutionality of its law providing limits on attorneys' fees and costs, but, as just mentioned, our court primarily relies on the Kansas court's analysis of the due process argument. Our court correctly acknowledges that the *Stephan* decision holds that the Kansas "fee-cap" law was not unconstitutional *per se*. The majority court then, however, fails to discuss the full rationale employed by the *Stephan* court when deciding how the Kansas law could be (and was in that case) unconstitutionally applied. First, the Kansas Supreme Court stated the following:

> Requiring attorneys to donate a reasonable amount of time to indigent defense work bears a real and substantial relation to the legitimate government objective sought — protection of indigent defendants' Sixth Amendment right to counsel. Such a requirement may also be reasonable in light of the general ethical responsibility of lawyers to make legal services available. Clearly the Indigent Defense Services Act was adopted in the interest of the community. *Under such an analysis, the statute on its face does not violate due process.* (Emphasis added.)

*Stephan*, 242 Kan. at 363, 747 P.2d at 838.

After stating the above, the Kansas Court then proceeded into a lengthy discussion of how the Kansas Indigent Defense Services Act could be unconstitutional in its application. In doing so, the court discussed how the Fifth Amendment has been applied to limit the state's powers of eminent domain and, citing Kansas case law, defined a taking under the Fifth Amendment as "acquiring of possession and the right of possession and control of *tangible* property to the exclusion of the former owner." The court indicated the services of an attorney are not protected by the Fifth Amendment, but if the property taken is viewed as the attorney's money, it is protected as tangible property. The Kansas Court held that when the attorney is required to advance expense funds out-of-pocket for an indigent, without full reimbursement, the Kansas system violated the Fifth Amendment. Similarly, when an attorney is required to spend an unreasonable amount of time on indigent appointments so that there is a substantial interference with his or her private practice, again, the Kansas system violated the Fifth Amendment. Before turning to our state law and its application, I should mention the majority opinion emphasizes a sentence from the *Stephan* case that states, "We conclude that the attorneys' services are property, and are thus subject to Fifth Amendment protection." Of course, such principle is true as the Kansas Supreme Court applied it in *Stephan*, but the Kansas Court made it abundantly clear that the services to which the court referred were as it had thoroughly described, *viz.*, services are not protected by the Fifth Amendment unless it is properly viewed as the attorneys' money or tangible property.

In applying the rationale of the *Stephan* case to the situation before us — as I understand is our majority court's intention — the appellants have certainly shown the fee and costs caps contained in § 16-92-108 are unconstitutional as applied to them. Appellants were appointed to defend Suzan A. Jernigan against capital murder charges, and under § 16-92-108, appellants are limited to a fee of $1,000.00 and costs in the sum of $100.00. Appellants have shown that, as of February 20, 1991, they have provided over $3,389.00 in overhead expenses.

Unquestionably, Arkansas' statutory limits on fees and costs, like Kansas's, will require modification by our General

Assembly. However, I would disagree with any suggestion that attorneys' fees in indigent criminal cases should be in line with fees paid other attorneys in the community for similar cases. In their due process argument, appellants suggest they should be entitled to just compensation and speak in terms of setting such fees at what they call "market value." The majority opinion merely provides the trial court should determine fees that are considered "just" and makes no reference to market value. I am not clear as to what the majority means by "just fees," but if it intends that term to mean the hourly rates that were testified to in this case, *viz.*, ranging from $75.00 to $125.00 per hour, I must disagree with such a holding. Such a result would obviously place Arkansas in a position that requires it to pay appointed counsel far more than what the federal government pays under its law.[1] More importantly, the majority's suggestions wholly ignore the *Stephan* decision on this point where the Kansas court stated the following:

> We agree fully that the bar of this state has an ethical obligation to provide legal services to the indigent accused. That ethical obligation may justify paying attorneys a reduced fee for legal services to the poor, less than the fee an attorney might charge a financially solvent client for the same service, but not less than the lawyers' average expenses statewide.

*Id.* at 375, 747 P.2d at 845.

Again, quoting the Kansas Court, it concluded, "The state also has an obligation to pay appointed counsel such sums as will fairly compensate the attorney, not at the top rate an attorney might charge, but at a rate which is not confiscatory, considering overhead and expenses." *Id.* at 383, 747 P.2d at 849.

In conclusion, I note my concern that the method and

---

[1] *See* 18 USCA § 3006A (Supp. 1991) which, among other things, compensates appointed attorneys at a rate not exceeding $60.00 per hour for in-court services and $40.00 per hour for out-of-court services unless the Judicial Conference determines a higher rate not in excess of $75.00 per hour is justified. A maximum amount of $3,500.00 in felony cases and $1,000.00 in misdemeanors is established by the federal law which may be waived if the trial court or magistrate certifies a higher amount is necessary to provide a fair compensation. *See* 18 USCA § 3006A(d)(3) (Supp. 1991).

manner the majority adopts in establishing fees in appointed cases is somewhat vague since the term "just fees" has the connotation of "just compensation" and "just compensation" is generally measured in terms of market value. The use of market value in assessing fees departs from all cases I have read on this subject with the exception of the case of *Delisio* v. *Alaska Superior Court*, 740 P.2d 437 (Alaska 1987), where the Alaska Supreme Court held such fees should be fixed at "market value." In my view, this part of the *DeLisio* case is an aberration and should not be followed. Such a path is not required by our law and will surely pose an added financial burden for our state. For emphasis, I point out that out of the 22,253 criminal cases terminated in the state during 1990, 2,875 cases were known to be handled by appointed attorneys and 5,601 cases were known to be handled by public defenders. Also, I believe this court's adoption of "market value" fees, as suggested by appellants, would prove counterproductive to indigent defendants and private individual attorneys having considerable criminal defense experience, because the state may be forced to establish a public defender system that will cover all 75 counties in order to be able to know what its costs will be in providing necessary representation to indigents.

For the foregoing reasons, I concur in the majority's decision to reverse the order finding appellants in contempt. However, I disagree with any interpretation which might be given to the majority holding that "just fees" means fees assessed at market value or at the top rates testified to in this case.

Instead, like the court did in *Stephan*, I would limit this court's opinion to read that an appointed attorney may be fairly compensated for Fifth Amendment purposes at a rate which is not confiscatory, considering overhead and expenses. In doing so, the General Assembly would then have the flexibility to adopt a fee schedule in indigent cases similar to the one employed under federal law — an option I view as being constitutional but precluded by a "market value" requirement.

HAYS, J., joins this concurrence.