Rodney LANES *v.* STATE of Arkansas

CA CR 94-1267 922 S.W.2d 349

Court of Appeals of Arkansas
Division I
Opinion delivered May 22, 1996█

*Etoch Law Firm*, by: *Louis A. Etoch*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee.

JOHN E. JENNINGS, Chief Judge. On November 25, 1992, Michael Perry was found shot to death in a park near his home in Marianna. Appellant, Rodney Lanes, was subsequently charged with capital murder in connection with Perry's death. Lanes was found guilty by a Lee County jury of the lesser-included offense of second-degree murder and was sentenced to a term of twenty years imprisonment.

On appeal Lanes contends that the judgment of the trial court should be reversed because (1) the evidence is insufficient to support the conviction, (2) the court erred in refusing to suppress his

statement given to police officers, (3) the court erred in admitting hearsay evidence, and (4) the attorney fee awarded by the trial court was so inadequate as to constitute an abuse of discretion. We find sufficient merit in appellant's third and fourth points to require reversal.

When reversal is sought both on the grounds of the insufficiency of the evidence and for other errors that may have occurred at trial, we may not reverse and remand for "trial error" without first having considered the sufficiency of the evidence. *Burks v. United States,* 437 U.S. 1 (1978); *Harris v. State,* 284 Ark. 247, 681 S.W.2d 334 (1984). This rule is based upon the Double Jeopardy Clause. *Harris v. State, supra.*

Evidence to support a conviction, whether direct or circumstantial, must be of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or another. *Kirkpatrick v. State,* 322 Ark. 728, 912 S.W.2d 917 (1995). On appeal we view the evidence in a light most favorable to the State and look only to that evidence which supports the verdict. *Smith v. State,* 308 Ark. 390, 824 S.W.2d 838 (1992). In determining the sufficiency of the evidence we consider all of the evidence, including that which was erroneously admitted. *Burkett v. State,* 40 Ark. App. 150, 842 S.W.2d 857 (1992).

At trial, James Sexton, an officer with the Marianna Police Department, testified that he investigated the Michael Perry murder scene on November 25, 1992. No one at the scene had seen anything. When the EMTs rolled the body over they found what appeared to be "crack." Officer Sexton testified that Mr. Perry's billfold was not found.

A statement given by appellant to police officers in April 1993 was admitted into evidence:

> Fred and I went to Michael Perry's shop and Fred talked to Michael. They went into Michael's office and talked there. Fred came out and we left. It was after 10 p.m. when we left. We went up to the liquor store (Spirit of 75). On the way to the liquor store Fred said if GunTee don't want to get it, do you want to get Mike. That's Michael Perry. I told him nope because Michael and I grew up together. I told him if I wanted some dope, all I had to do was ask Michael and then not pay him because Michael would not do anything. We

went to my sister's house (Sharon Lanes) and I used the telephone. We left there and went by GunTee's house. He wasn't there so we went to the park and Fred parked the car next to the fence. We were facing Michael Perry's mother's house (Marine's Street). Fred, got out of the car and met Michael halfway, then when they walked up to the car where I was sitting in the passenger seat. Michael handed me a one-half ounce rock. I looked at the rock and gave it back to Michael. Then he asked me was it straight, and I said yeah, and then he gave it back to me. He and Fred was talking and Michael told Fred how much he wanted for it. Fred said pay him Rodney and I patted my pockets and said with what and Fred said you ain't got no money on you and then pulled a black pistol from his coat pocket and shot Michael. Michael put both hands up to his face and said please man don't shoot me and was backing up toward the fence and Fred shot about three more times. Then Fred ran and got in the car and drove away towards Claybrook Court. I said you should not have did that. He just said fuck it. Fred turned around in the street and went back to see if Michael was dead and we couldn't find him. We went to Walnut Grove Church and picked up Jerome and Chris and went to Forrest City. On the way to Forrest City just before you get to Haynes, Fred threw that pistol out the window. He threw it over the car into the field on my side of the car. We went to Jevena's house at Forrest City and Fred and Chris dropped Jerome and me off and they [went] back to Marianna.

J.C. Aikens Jr. testified that on the night Michael Perry was killed he saw appellant and Fred Westbrook. They each had pistols, Westbrook a .38 and appellant a .22. Aikens testified, "I heard them say they were going to rob somebody, you know, take their money or something like. They mentioned Gun-T and Elias Hill and Michael Perry."

Jerry Vest, an employee of the Arkansas Highway Department, testified that in January 1993, he found a .38 revolver in a ditch near Haynes and Forrest City. Ronald Andrejack, a firearms examiner for the Arkansas Crime Laboratory, testified that the bullet he received from the Marianna Police Department was fired from this same .38 revolver. Edna Malone, Michael Perry's mother, testified that between 10:00 and 10:30 on the night in question Perry was

counting out a "ball of money." Soon after he went outside she heard three gunshots. At the hospital, she was given Michael Perry's billfold and there was no money in it.

Kevin Caffey testified that on November 25, 1992, he saw Fred Westbrook and the appellant drive up together to Michael Perry's pool hall. He testified that Westbrook went over and talked to Perry. Johnny Woodson, also known as "Gun-T," testified that on November 25 Westbrook and appellant came to his house and Westbrook tried to sell him some drugs. He testified that he heard Westbrook ask appellant if he wanted a gun.

Dr. William Sturner, the state medical examiner, testified that he performed an autopsy on Michael Perry and that Perry died as a result of a single gunshot wound, which passed through his face, neck, and chest.

James Robinson, Michael Perry's cousin, testified that he saw Westbrook and appellant in Little Rock the day after Perry was killed. He talked with appellant, who told him that Westbrook had shot Michael Perry. Over appellant's objection, Robinson was also permitted to testify that Westbrook told him that appellant shot Perry. This evidence was admitted to show that Westbrook and appellant were each "pointing the finger at each other." The court instructed the jury not to consider the statement for the truth of the matter asserted but did not further explain its relevance.

■■ We hold that the evidence was legally sufficient to support appellant's conviction of second-degree murder. On this lesser-included offense, the trial court correctly instructed the jury that the State had the burden of proving that appellant knowingly caused the death of Michael Perry under circumstances manifesting extreme indifference to the value of human life. See Ark. Code Ann. § 5-10-103 (Repl. 1993). The jury was also instructed on accomplice liability. As the State points out, factors relevant to determining whether a person is an accomplice include the presence of the accused near the crime, the accused's opportunity to commit the crime, and association with a person involved in the crime in a manner suggestive of joint participation. See Banks v. State, 315 Ark. 666, 869 S.W.2d 700 (1994).

Appellant next argues that the trial court erred in declining to suppress the statement he made while in custody. Appellant states that the original information was filed on March 9, 1993, charging

him with the murder of Michael Perry. The State notes that although the original information is not contained in the record on appeal, appellant was charged sometime before April 2, 1993, because on that date, even though he had not yet been arrested, an attorney was appointed to represent him.

Appellant was arrested on April 28, 1993, and his first appearance was set for April 30. On April 29 he was interviewed in the Phillips County jail by Sergeant James Sexton of the Marianna Police Department and Investigator Barry Roy of the Arkansas State Police.

At the pretrial Denno hearing both officers testified that appellant's statement was voluntarily given. Appellant signed a waiver of rights, acknowledging that he had the right to counsel and that he expressly waived that right. Indeed, no contention is made that the rights waiver was inadequate in form or content.

Investigator Roy conducted the interview, which lasted between one and two hours. After appellant first made a statement denying any involvement, Roy told appellant that it would be in his best interest to tell the truth. At this point appellant gave the statement that was subsequently admitted at trial.

Both officers testified that they were unaware that counsel had previously been appointed for appellant. Joe Perry, the private attorney appointed pursuant to the April 2 docket entry, testified that he had not talked to appellant before the April 29 interview. It is evident that appellant himself was unaware that an attorney had been appointed to represent him.

 Custodial statements are presumed involuntary, and the State had the burden of proving otherwise. *Shaw v. State*, 299 Ark. 474, 773 S.W.2d 827 (1989). The State must therefore make a prima facie showing that the accused knowingly, voluntarily, and intelligently waived his right to remain silent. *Morris v. State*, 302 Ark. 532, 792 S.W.2d 288 (1990). In reviewing the trial court's denial of the motion to suppress, we make an independent determination based on the totality of the circumstances and reverse the trial court only if the decision was clearly against a preponderance of the evidence. *Dickerson v. State*, 51 Ark. App. 64, 909 S.W.2d 653 (1995). The credibility of the witnesses who testified to the circumstances surrounding appellant's custodial statement is for the trial court to determine. *See Smith v. State*, 286 Ark. 247, 691 S.W.2d

154 (1985). Within the context of an independent review, our search focuses on whether the accused wished to remain silent, and gave such expression to that desire that any statements made thereafter in response to interrogation are in violation of *Miranda* v. *Arizona*, 384 U.S. 436 (1966). *See Johnson* v. *State*, 307 Ark. 525, 823 S.W.2d 440 (1992).

■ Appellant first argues that the statement was "the result of lengthy interrogation, threats of the death penalty, and only after Investigator Roy explained to Lanes it was in his best interests to give it." We do not regard the interrogation as unduly lengthy, nor do we think the officers' statement of the possible penalties for the crime with which appellant was charged constitutes a threat. Similarly, the officers' statement that it would be in appellant's best interest to tell the truth is not, in itself, objectionable. *See Noble* v. *State*, 319 Ark. 407, 892 S.W.2d 477 (1995).

Appellant's more serious argument is that principles announced in *Michigan* v. *Jackson*, 475 U.S. 625 (1986), require suppression of the statement. *Michigan* v. *Jackson* involved two consolidated cases. One defendant, Bladel, was arraigned on a murder charge and asked at his arraignment that an attorney be appointed. The Court appointed counsel and mailed a notice of the appointment to a law firm. Before the notice was received, police officers interviewed Bladel and, after advising him of his *Miranda* rights, obtained a confession.

Jackson, the other defendant, also asked that counsel be appointed for him during his arraignment on murder charges. The next day, before he had an opportunity to consult with counsel, police officers interviewed him and, again after advising him of his rights under *Miranda*, obtained a confession. In both cases the investigating officers were present at the arraignment.

In both instances the *Michigan* trial courts denied the defendants' motion to suppress. The Michigan Supreme Court reversed, holding that the rule in *Edwards* v. *Arizona*, 451 U.S. 477 (1981), "applies by analogy to those situations where an accused requests counsel before the arraigning magistrate. Once this request occurs, the police may not conduct further interrogations until counsel has been made available to the accused, unless the accused initiates further communications, exchanges, or conversations with the police.... The police cannot simply ignore a defendant's unequivo-

cal request for counsel." 421 Mich. 39, 365 N.W.2d 56 (1984).

The United States Supreme Court affirmed and in the course of its opinion said:

> Indeed, after a formal accusation has been made — and a person who had previously been just a "suspect" has become an "accused" within the meaning of the Sixth Amendment — the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation.
>
> . . . .
>
> The State points to another factual difference: the police may not know of the defendant's request for attorney at the arraignment. That claimed distinction is similarly unavailing. In the cases at bar, in which the officers in charge of the investigations of respondents were present at the arraignments, the argument is particularly unconvincing. More generally, however, Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court).

Thus, appellant argues that an attorney had been appointed for him and the officers' lack of knowledge of this is irrelevant. The critical difference, however, between *Michigan* v. *Jackson* and the case at bar is that in *Jackson* both Jackson and Bladel *asked* that counsel be appointed to represent them. Here, appellant made no request for counsel and was unaware that counsel had been appointed. In *Moran* v. *Burbine*, 475 U.S. 412, 422 (1986), the Court said, "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *See also, Bussard* v. *State*, 296 Ark. 556, 562, 759 S.W.2d 24, 27 (1988) (Newbern, J., dissenting). We conclude that the trial court's determination that both the waiver and the statement were knowingly and voluntarily given should be affirmed.

■ Appellant next argues that the trial court erred in admitting the testimony of James Robinson to the effect that Fred Westbrook told him that appellant shot Michael Perry. We agree. Arkansas Rule of Evidence 802 provides that hearsay is generally inadmissible. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ark. R. Evid. Rule 801(c). The State's theory at trial was that this evidence was admissible to prove that both Westbrook and Lanes were "pointing the finger at each other." This theory does not fit within any recognizable hearsay exception. And while it is true that the trial court instructed the jury not to consider the evidence for "the truth of the matter asserted," the court did not explain to the jury why the evidence was otherwise relevant. Here the fact that the statement was made has no apparent relevance, apart from its content. Despite the court's admonition to the jury, the statement was clearly inadmissible hearsay. See Davis v. State, 38 Ark. App. 115, 828 S.W.2d 863 (1992). Finally, given the nature of the other evidence in the case, we cannot say with any confidence that the error was harmless. The case must therefore be reversed and remanded on this point.

■ At the conclusion of the trial, the circuit court awarded appellant's counsel, Mr. Lewis Etoch, an attorney's fee of $3,500.00. In the past few years the applicable principles of law have become fairly clear. The trial court should determine fees that are just, taking into consideration the experience and ability of the attorney, the time and labor required to perform the legal service properly, the novelty and difficulty of the issues involved, the fee customarily charged in the locality for similar legal services, the time limitations imposed upon the client's defense or by the circumstances, and the likelihood, if apparent to the court, that the acceptance of the particular employment will preclude other employment by the lawyer. Arnold v. Kemp, 306 Ark. 294, 813 S.W.2d 770 (1991); see also State v. Crittenden County, 320 Ark. 356, 896 S.W.2d 881 (1995). There is no fixed formula for computing attorney's fees, and the appellate court will defer to the superior perspective of the trial judge to weigh and apply the factors set forth in Arnold v. Kemp, because of the trial court's intimate familiarity with the proceedings and with the quality of services rendered. Price v. State, 313 Ark. 96, 98-A, 856 S.W.2d 10 (1993), (supplemental opinion denying rehearing); State v. Crittenden County, supra. The

discretion of the trial court will not be disturbed on appeal in the absence of an abuse of that discretion. *Price, supra; State v. Campbell,* 312 Ark. 593, 851 S.W.2d 434 (1993). "Just compensation" does not mean full compensation in the sense that the trial court need not simply award fees based on the attorney's customary hourly charges. *See State v. Campbell, supra; Arnold v. Kemp, supra.*

After trial Mr. Etoch presented a petition seeking attorney's fees in the amount of $19,500.00. The petition recited that Mr. Etoch practiced law for more than five years in Helena; that he would customarily charge $110.00 per hour in a capital murder case; that he had tried more than fifteen felony criminal jury cases; and that he devotes a substantial amount of his practice to criminal law. Mr. Etoch submitted an itemized statement that shows a total of 138.75 hours expended in the case together with another itemized statement from his father, Mike Etoch, showing an additional 29 hours expended in assisting. He appended an affidavit from Jimmy L. Wilson, a Phillips County attorney, which stated, among other things, that the fee Etoch sought was fair and reasonable.

After the court awarded the fee, Mr. Etoch petitioned for reconsideration and the court entered an order:

### Findings of Fact

Mr. Louis Etoch, appointed attorney for Rodney Lanes, has filed a "Petition for Reconsideration of Attorney's Fees, Specific Findings of Facts and Conclusions of Law, A Request for A Hearing" and the Court finds:

Mr. Louis Etoch was appointed to represent Rodney Lanes.

Mr. Etoch represented Rodney Lanes at trial in Lee County.

Mr. Etoch's request for fee is shockingly exorbitant, outrageous, totally unwarranted, and an example of gross unprofessionalism.

The trial transcript is replete with examples of the uncivil, irreverent and disrespectful conduct of Mr. Etoch. This uncharacteristic misconduct and patent disrespect for the court was considered when the attorney's fee was set. The court did not intend to punish Mr. Etoch, but rather to

try to teach him that disrespect for the authority of the court and unprofessionalism do not pay.

A good example was when the Court ruled on what would be permissible under Rules of Evidence No. 609 in Mr. Etoch's cross-examination of a state's witness. Mr. Etoch contemptuously ignored the rulings of the Court in direct violation of same.

An example of the misuse of the Court's time was when Mr. Etoch caused the Court to hold a special hearing on the manner in which the venire was notified. This occurred after the trial. During voir dire, Mr. Etoch did not exercise all of the available peremptory challenges.

A few minutes of simple, preparatory research would have quickly revealed that a criminal defendant cannot complain of the jury composition if he does not exhaust his peremptory challenges; *Brown* v. *State*, 395 S.W.2d 344, 239 Ark. 909, *cert. denied* 86 S. Ct. 1985.

*Arnold* v. *Kemp*, 813 S.W.2d 770, 306 Ark. 294 (1991), holds that the trial court should consider the following to determine compensation for attorneys representing indigent criminal defendants:

a.) experience and ability
b.) time and labor
c.) novelty and difficulty of issues involved

*State* v. *Independence County*, 850 S.W.2d 842, 312 Ark. 472 (1993), stated:

"In awarding fees to Messrs. Arnold and Allen for reasonably expended services, we do not mean that the trial court must simply award fees based on their customary hourly charges or fixed fees" and

"time spent on theories which are unfounded in fact or law, or those which have been repeatedly rejected by appellate courts, are presumptively noncompensable absent special circumstances."

## Conclusions

The trial court has both the right and duty not to allow an attorney to misuse valuable trial time.

The trial court has a duty not to allow an attorney to succeed in a course of action resulting in an unwarranted attorney's fee.

The trial court has the right and duty to use the criteria set forth in *Arnold* v. *Kemp, supra,* in setting attorneys' fees, and to also consider, when appropriate, the following additional criteria:

a.) professionalism
b.) respect for the Court
c.) proper use of trial court time
d.) courteousness
e.) contemptuous behavior

The previously set attorney fee of $3,500.00 is appropriate in this case.

To accede to Mr. Etoch's request for a higher fee would be a serious mistake and encourage greed, avarice, and unprofessional conduct.

IT IS THEREFORE BY THIS COURT ORDERED THAT Mr. Etoch's Petition for Reconsideration and other relief, be and the same is hereby denied.

We cannot say that the "additional criteria" considered by the trial judge in setting the attorney's fee are not factors that the court may consider, although they were not among those mentioned by the supreme court in *Arnold* v. *Kemp* and subsequent cases. We do note that there is considerable overlapping among the additional factors considered by the judge.

We cannot say that the judge was wrong to factor in the apparently unnecessary hearing related to the jury panel. The trial court's assertion that Mr. Etoch "contemptuously ignored" the trial judge's ruling on the State's motion in limine as to the scope of cross-examination of J.C. Aikens Jr. is somewhat less clear. But in any event the trial court's finding of fact that Mr. Etoch's fee request was "shockingly exorbitant" and an example of "gross

unprofessionalism" is not supported by this record. Nor is the trial court's finding that the record is "replete with examples of the uncivil, irreverent, and disrespectful conduct of Mr. Etoch." To the contrary, the record as a whole demonstrates that Mr. Etoch generally conducted himself in a civil and professional manner throughout the trial.

We have come to the conclusion that the circuit court, in setting the attorney's fee, focused too much on an isolated incident and not enough on those factors set forth by the supreme court in *Arnold* v. *Kemp, supra.*

We take judicial notice that Judge Wilkinson, after many years of honorable service, has now retired. Because the case must be reversed and remanded for a new trial, we likewise remand the question of an appropriate attorney's fee and direct that the circuit court set the fee after conducting whatever hearing, if any, the court may deem necessary.

Reversed and remanded.

MAYFIELD and NEAL, JJ., agree.