*In re* RECORDER'S COURT BAR ASSOCIATION v
WAYNE CIRCUIT COURT

Docket No. 86099. Argued November 9, 1992 (Calendar No. 1). Decided August 3, 1993.

The Recorder's Court Bar Association and others sought superintending control by the Michigan Supreme Court, challenging the reasonableness and constitutionality of fixed-fee schedules in the Wayne Circuit and Detroit Recorder's Courts for compensation of counsel assigned to represent indigent defendants. The fees compensate representation through sentencing, regardless of events, on the basis of the maximum penalty imposable for the crime charged. The petitioners urge the Court to invalidate the fixed-fee schedule and to order the Third Circuit Court and the Detroit Recorder's Court to adopt and implement an event-based fee schedule. A special master, Tyrone Gillespie, J., appointed by the Supreme Court, conducted an evidentiary hearing and proposed findings of fact.

In an opinion by Chief Justice CAVANAGH, joined by Justices LEVIN, BRICKLEY, RILEY, GRIFFIN, and MALLETT, the Supreme Court *held:*

The fixed-fee compensation system currently used in the Third Circuit and Detroit Recorder's Courts systematically fails to provide reasonable compensation within the meaning of MCL 775.16; MSA 28.1253. Determination of what specific system or method of compensating assigned counsel is to be implemented is left to the sound discretion of the chief judges of those courts, who are to discontinue compensating assigned counsel under the fixed-fee system, as it currently exists, for all indigent defense assignments made after December 31, 1993, and to develop and file with the Supreme Court on or before December 1, 1993, for implementation on and after January 1, 1994, a payment system that reasonably compensates assigned counsel for services performed.

1. Assigned counsel are entitled, pursuant to MCL 775.16; MSA 28.1253, to reasonable compensation for providing criminal defense services to indigent defendants, and the Legislature clearly intended individualized determinations of what compensation is reasonable. The statute does not require the mechanical calculation of reasonable compensation in every case, nor

does it require any specific type of compensation system or imply that a fixed-fee system could never provide reasonable compensation. Rather, whatever system or method is employed, the compensation actually paid must be reasonably related to the services actually performed.

2. The present fee system systematically fails to provide assigned counsel reasonable compensation. Based as it is on an average of fees actually paid under a former system, it has resulted in both over- and undercompensation, and provides ineffective remedies.

3. Because the fixed-fee system fails to assure that individual attorneys are reasonably compensated for the services they perform, the chief judges have failed to perform their clear legal duties to pay such compensation and to provide an adequate legal remedy to cure the systematic unreasonableness of the current compensation system, justifying the exercise of the extraordinary power of superintending control.

Superintending control granted.

Justice BOYLE, concurring in part and dissenting in part, stated that because the defendants have not violated a clear legal duty, superintending control is not an appropriate remedy.

*Bellanca, Beattie & DeLisle, P.C.* (by *Frank D. Eaman*), for the plaintiff.

*Joseph F. Chiesa, Diane P. Lemanek, and Kimberley D.R. Reed,* for respondent Chief Judge of Wayne County Circuit Court.

*Hon. Richard Kaufman* and *Dykema, Gossett* (by *Kathleen McCree Lewis* and *Cheryl A. Fletcher*) for intervening respondent Wayne County.

Amici Curiae:

*Barbara R. Levine* for Michigan Appellate Assigned Counsel System.

*Kraizman & Kraizman* (by *Sidney Kraizman* and *Frederick M. Finn*) for the Detroit Bar Association.

*Law, Weathers & Richardson* (by *Douglas W. Van Essen*) for the Funding Class of Michigan Municipalities.

CAVANAGH, C.J. We are asked in this case to determine whether the assigned counsel compensation system currently utilized in the Wayne Circuit Court[1] and the Detroit Recorder's Court provides counsel assigned to represent indigent defendants "reasonable compensation" within the meaning of MCL 775.16; MSA 28.1253. We hold that it does not. Because we decide this issue in favor of the petitioners, we need not reach the remaining issues raised in this complaint for superintending control.[2]

I

In June 1988, Chief Judges Dalton A. Roberson of the Detroit Recorder's Court and Richard C. Kaufman of the Third Circuit Court promulgated the fee schedule currently in dispute. Unlike previous fee schedules which compensated counsel on the basis of representational "events" performed by assigned counsel, the new fee schedule operates to pay a "fixed-fee" for the entire representation through sentencing, regardless of events, on the

---

[1] Hereafter Third Circuit Court.

[2] The other issues raised by the petitioners include: (1) whether the fixed-fee system results in lowering the quality of indigent representation to a level that is inadequate under the Sixth Amendment of the United States Constitution; (2) whether the fixed-fee system operates to deprive indigent defense counsel of equal protection and due process of law, contrary to the Fourteenth Amendment of the United States Constitution and Const 1963, art 1, § 2; and (3) whether the fixed-fee system operates to "take" the property of assigned counsel without just compensation and due process of law, contrary to the Fifth and Fourteenth Amendments of the United States Constitution and Const 1963, art 10, § 2. See *Taylor v Auditor General,* 360 Mich 146, 154; 103 NW2d 769 (1960) (stating that "few principles of judicial interpretation are more firmly grounded than this: a court does not grapple with a constitutional issue except as a last resort").

basis of the maximum penalty imposable for the crime charged. This fee schedule became effective July 1, 1988, and remains in effect as of the date of this opinion. The petitioners filed a complaint for superintending control in this Court on May 5, 1989, challenging the reasonableness and constitutionality of the fixed-fee schedule. Specifically, the petitioners asked this Court to invalidate the fixed-fee schedule and to order the Third Circuit Court and the Detroit Recorder's Court to adopt and implement an "event-based" fee schedule developed in 1981 by a committee headed by Recorder's Court Judge Clarice Jobes[3] adjusted for inflation.

Unable to resolve this case without the aid of a factual record, we appointed the Honorable Tyrone Gillespie as special master and directed him to conduct an evidentiary hearing and to propose findings of fact to this Court on the following topics:

> (1) the various rates of reimbursement for appointed counsel in Michigan; (2) the amount of overhead and expenses typically incurred by attorneys who accept appointments to represent indigent criminal defendants; (3) the amount of in-

[3] In 1981, a complaint for superintending control was filed in this Court seeking an increase in fees paid under the fee schedule then existing in the Third Circuit Court and the Detroit Recorder's Court. In response to this complaint, the chief judges formed a committee, headed by Recorder's Court Judge Clarice Jobes, to study the fee system. After completing the study, Judge Jobes issued a report, recommending fee increases that roughly tripled the fees that were being paid for certain key items, particularly trial per diem. The recommended fee schedule, which became known as the "Jobes Plan," was to remain event-based.

After acknowledging the reasonableness of the compensation rates proposed by the Jobes' committee, the chief judges voted to adopt the Jobes Plan without revision and scheduled it to become effective December 1, 1982. The plan was never instituted, however, because the chief judges succumbed to county budgetary concerns and refused to implement the plan. Instead, the chief judges formulated yet another fee schedule that operated to compensate assigned counsel at significantly lower rates.

come which may typically be generated by acceptance of appointments; (4) the amount of attorney and staff time spent to generate amounts of income from appointments; (5) instances of pressures to under-represent indigent defendants; and (6) any other topics which any party or the special master thinks will help this Court resolve the issues presented in this case.

Thirty-two witnesses testified during twelve full days of hearings that began January 16, 1990, and ended February 16, 1990. Judge Gillespie issued proposed findings of fact in a 226-page report on April 3, 1991. In his report, Judge Gillespie noted that the assigned counsel compensation systems utilized in this state vary to some degree from circuit to circuit. The Third Circuit Court and Detroit Recorder's Court were, however, the only courts to use a fixed-fee schedule that pays a flat fee to assigned counsel on the basis of the potential maximum sentence that a defendant may face, if convicted.

Judge Gillespie also noted a wide variation in the profitability of accepting indigent defense cases under the fixed-fee system. He cites two primary reasons for this variation: (1) the disparity in attorney overhead[4] and expenses,[5] and (2) case

---

[4] Although Judge Gillespie found that "the average overhead rate [for attorneys] in the Detroit area varies from $35 to $45 an hour," he also noted that there are a number of attorneys who are assigned criminal cases that have little, if any, overhead. Estimated to constitute approximately ten to fifteen percent of the criminal bar in Wayne County, these attorneys are referred to as "waivers and pleaders" who operate from pocket notes without secretaries or offices who live on guilty pleas.

[5] The fees paid for expert witnesses such as psychologists, psychiatrists, medical experts, interpreters, investigators and other supplemental requirements are so low as to make their services unavailable without supplementation of funds by the attorney. Some costs, such as postage, copy and local travel, are never reimbursed.

complexity. Of the two, Judge Gillespie found that perhaps the most determinative factor in the realization of income under the fixed-fee system is the complexity of the assigned case. In this regard, Judge Gillespie observed an "inverse relationship" between effort expended and fees paid under the fixed-fee system. Although noting that the system had the meritorious effect of speeding up the docket,[6] Judge Gillespie found that the system tends to encourage assigned counsel to persuade their clients to plead guilty, stating:

The incentive, if a lawyer is not paid to spend more time with and for the client, is to put in as little time as possible for the pay allowed. Under the current system, a lawyer can earn $100 an hour for a guilty plea, whereas if he or she goes to trial the earnings may be $15 an hour or less. Essential motions are neglected.

In short, the system of reimbursement of assigned counsel as it now exists creates a conflict between the attorney's need to be paid fully for his services and obtaining the full panoply of rights for the client. Only the very conscientious will do the latter against his or her own interests.[7]

---

[6] In addition to the beneficial effect that the fixed-fee system has on the docket, Judge Gillespie also found that the fixed-fee compensation system had merit because: (1) it "shortens the time between arrest and disposition, thus alleviating some of the pressure for more jail space"; (2) "[i]f a client is pled guilty quickly, the compensation is very adequate as it represents payment for only three or four hours of attorney time"; (3) "[f]rivolous motions are reduced as there is no financial incentive to do work which merely takes time"; (4) "[a]lternative resolutions, such as work release and probation, are encouraged"; (5) "[d]ismissals of weak cases occur at an early stage"; (6) "[p]adding of hourly accounts is eliminated"; and (7) "[t]he system [itself] is administratively easier to operate."

[7] In addition to encouraging counsel to pressure clients to plead guilty and discouraging the filing of even serious motions, Judge Gillespie found that the fixed-fee system: (1) "discourages plea bargaining in that the prosecutor is aware that the defense attorney has no financial incentive to go to trial and will assent to a guilty plea to a higher charge"; (2) encourages appointing judges to assign cases on the basis of favoritism; and (3) "supports a group of substandard

Judge Gillespie ultimately concluded that any benefits derived from the system did not outweigh the negative aspects of paying assigned counsel in such a manner. Accordingly, Judge Gillespie recommended that this Court find the fixed-fee method of compensating assigned counsel based on the seriousness of the crime to be unreasonable, unjust, and a disincentive to due process.[8]

Having considered the record developed at the special hearing, along with the briefs and oral arguments of the parties, we now hold that the fixed-fee system currently utilized in the Third Circuit Court and the Detroit Recorder's Court systematically fails to provide "reasonable compensation" within the meaning of MCL 775.16; MSA 28.1253. We decline, however, the invitation to direct the implementation of any specific system or method of compensating assigned counsel, electing instead to leave that determination to the sound discretion of the chief judges of the respective courts.

---

attorneys, estimated to be 10 to 15% of the criminal bar, to [sic] operate without offices, secretaries, files, from pocket notes and to make a living on guilty pleas."

[8] Judge Gillespie proposed three alternative remedies:

A. That a study be made of reasonable time involved to defend each of the crimes in the present schedule, thus establishing a norm similar to those used by garages in estimating repair work. If the fee request submitted falls within the norm, it would be automatically approved for the time expended at a reasonable rate of $60 to $70 per hour. Excesses would have to be justified.

B. Do as the plaintiff asks and install the Jobes Committee report with a reasonable escalator based on inflation since 1982.

C. Direct the court to devise an alternative plan within a reasonable time which would: (1) compensate attorneys fairly for time spent, and (2) put no pressure on defendants to plead guilty.

II

From 1967 to 1988, the Third Circuit Court and the Detroit Recorder's Court utilized an "event-based" fee system to compensate counsel assigned to represent indigent criminal defendants. Under this system, assigned counsel was compensated on the basis of the type and number of representational tasks performed in providing ordinary legal services to indigent criminal defendants.[9]

In an effort to reduce jail overcrowding, a "jail oversight committee," comprised of various county officials, was formed to examine the Wayne County criminal justice system and to make recommendations, concerning how to reduce demand for jail beds. The committee found a direct correlation between jail bed demand and the length of the criminal docket. Given the volume of criminal cases in Wayne County, the committee concluded that a substantial savings in jail bed demand could be recognized by reducing the time between a defendant's arrest and the ultimate disposition of the case. Believing that a large percentage of cases were being pleaded "unnecessarily" late in the criminal judicial process, often on the day of trial, and concerned that the event-based system provided an incentive for assigned counsel to prolong final disposition of cases to earn an enhanced fee, the chief judges sought to develop a fee system that would operate to provide a disincentive to "unnecessarily" delay guilty pleas.

---

[9] A separate fee was paid for pre-preliminary examination jail visits, preliminary examinations, at least two post-preliminary examination jail visits (three, if the defendant was charged with a "capital" offense), investigation and trial preparation, written motions filed and heard, calendar conferences, arraignments on the information, final conferences, *Walker* hearings, evidentiary hearings, pleas, and forensic hearings. Perhaps most importantly, the former event-based fee system provided compensation for each day of trial necessary to dispose of any particular case. A separate fee was also paid for counsel appearances in court for defendant sentencings.

George Gish, Court Administrator and Clerk of the Detroit Recorder's Court, was assigned the task of devising a compensation system that would eliminate "unnecessary delay" and promote docket efficiency without reducing the overall level of compensation paid to assigned counsel. A statistical analysis revealed a direct correlation between the fees paid under the event-based fee system and the maximum sentence imposable for a particular crime under our recommended sentencing guidelines. In other words, the number of "events" performed in representing indigent defendants was found to be directly related to the maximum sentence that a defendant faced. Given this information, Mr. Gish grouped all assigned cases for the previous two years by potential maximum sentence and averaged the fees paid in each group of cases. The fixed-fee schedule therefore represents an average of actual fees paid under the event-based system, broken down by the maximum sentence imposable for any given crime. The fixed rates are:

| Offense Category | Fixed Fee |
|---|---|
| 24 month maximum | $ 475 |
| 36 month maximum | 500 |
| 48 month maximum | 525 |
| 60 month maximum | 550 |
| 84 month maximum | 575 |
| 120 month maximum | 600 |
| 168 month maximum | 625 |
| 180 month maximum | 650 |
| 240 month maximum | 675 |
| Life | 750 |
| Second-degree Murder | 1,000 |
| First-degree Murder | 1,400 |

Because the scheduled fees represent an average of the actual fees paid over a two-year period under the event-based fee system, compensation for indi-

vidual representational tasks such as jail visits, motions, and trial per diem are incorporated into the fixed fees.[10] Assigned counsel is entitled to the full fee, regardless whether the case is dismissed at the preliminary examination,[11] the defendant pleads guilty at the arraignment on the information, or the case is ultimately disposed of after a three-day jury trial.[12]

The fixed-fee system was designed to promote docket efficiency,[13] yet allow overall assigned counsel compensation to remain exactly the same as that paid under the event-based fee system that it replaced. The scheduled fees are regarded as best

[10] An attorney who is assigned a case in which the defendant is charged with multiple crimes is entitled only to the fee corresponding to the maximum sentence imposable for the most severe crime charged. Further, if a defendant is already assigned to an attorney and an additional charge is filed against that defendant, assigned counsel is entitled only to a fifty percent fee for the second crime even if the first crime is pleaded and the second crime requires a three-day trial. Reduced rates are also paid where a capias is issued because of a defendant's failure to appear, and in cases in which retained counsel replaces assigned counsel before final disposition of the case.

[11] Reduced rates are, however, paid for dismissals caused by complainants' failures to appear at preliminary examinations.

[12] As mentioned above, the fixed fees are based on the average total vouchers submitted under the event-based system over the two years immediately preceding the implementation of the extant fee system. Thus, the fixed fees necessarily incorporate all trial per diem paid under the event-based system. A study revealed that the average criminal jury trial in Wayne County took 3.1 days. Despite the fact that the odds of getting a case requiring over a three-day jury trial is already incorporated and theoretically compensated in the system, it is the unwritten policy of the chief judge of the Detroit Recorder's Court to award $300 per day for each trial day exceeding the three-day average. This is not the policy of the chief judge of the Third Circuit Court, however; there an attorney is forced to file an application for extraordinary fees.

[13] Specifically, the respondents sought to design a system to induce those cases that were going to plead anyway, to plead earlier in the criminal process, preferably at the arraignment on the information. The respondents contend that the fixed-fee schedule greatly enhances the probability of settling cases by plea, because paying assigned counsel the same fee, regardless of disposition, provides an "incentive" to assigned counsel to look harder at cases earlier so that meaningful plea discussions can occur.

estimates that are presumed to reasonably compensate assigned counsel for their services. The fee system expressly permits assigned counsel to petition the chief judges of the respective courts for payment of extraordinary fees in cases requiring above-average effort.[14]

Petitioning for extraordinary fees is not a particularly difficult procedure. Assigned counsel need only send a request for such fees on ordinary stationery and attach it to the payment voucher for the relevant case.[15] However, "[a]ll petitions for extraordinary fees must include an analysis of all assigned cases for the previous one year." Executive Chief Judge Kaufman described the reason for requiring this analysis as follows:

> The reason for that provision is this; that when the Flat-Fee amount was set in the schedule, it was done based upon the historical average of what we had paid for those particular charges when we had a per event schedule. Since we adopted a Flat-Fee that was the average, if, in fact, those were reasonable amounts, assuming for a moment that under the per event schedule what we were paying were reasonable amounts, then that meant that what we would pay attorneys on

[14] The petition for extraordinary fees is a procedural device that allows assigned counsel an opportunity to rebut the presumption of reasonable compensation with proof that payment of the scheduled fees fails to reasonably compensate for the services required in any particular case. Counsel is paid at a rate of $30 per hour. Entitlement to such fees is, however, completely discretionary with the chief judges and depends, at least in part, on an analysis of the amount of work required in other cases that a given attorney was assigned throughout the year.

[15] While both courts permit assigned counsel to file petitions for extraordinary fees, the specific method of dealing with the petitions once filed varies, depending on whether the case is technically under the jurisdiction of the Third Circuit Court or the Detroit Recorder's Court. For instance, petitions for extraordinary fees filed in Recorder's Court are first considered by the judge who presided in the case, while petitions filed in the Third Circuit Court are decided exclusively by the chief judge without input from presiding judges.

the Flat-Fee Schedule would be too high or more
than what they were getting under the per event
schedule. The basic idea being, that if, in fact, you
received twenty assignments under the Flat-Fee
Schedule, just to give a hypothetical situation, that
each case was dismissed after the exam, or you
waive the exam and the case got dismissed after a
half hour appearance at the [arraignment on the
information], you could have no more than two or
three hours invested in the case and get seven
hundred and fifty dollars. Well, that's a couple
hundred dollars an hour. If, in fact, that was the
situation for ten cases, it did not seem fair, to me,
or to the joint executive of the court who adopted
this joint administrative order, to say that you can
get overpaid in these other cases, but when you
get the one case that you've got to put some extra
time in, you're allowed extraordinary fees without
any analysis of the total of your assignments.

This rule is not strictly enforced. Thus, the failure
to include an analysis of fees earned in other cases
during the year in which extraordinary fees are
sought will not necessarily preclude recovery of
extraordinary fees. The absence of such analysis,
however, is often used to justify an award of
extraordinary fees lower than that requested.

III

As stated in *State v Rush,* 46 NJ 399, 404; 217
A2d 441 (1966), "[w]e are here concerned with the
burden of supplying the indigent with a free de-
fense." At common law, this burden was borne by
members of the bar as part of the obligations
assumed upon admission to practice law. *Id.* In-
deed, this Court held in 1850 that appointed coun-
sel had no right to compensation for representing
indigent criminal defendants. *Bacon v Wayne Co,*

1 Mich 461 (1850). The accuracy[16] and continued validity[17] of this traditional view has not, however, gone unchallenged.[18] Nevertheless, because assigned counsel in Michigan presently have a statutory right to reasonable compensation,[19] we need not reconsider here whether there may be an independent common-law basis in this state for awarding such compensation absent a·statute or court rule. See, e.g., anno: *Right of attorney appointed by court for indigent accused to, and court's power to award, compensation by public, in absence of statute or court rule*, 21 ALR3d 819.

IV

In Michigan, assigned counsel have a statutory right to compensation for providing criminal defense services to the indigent. The controlling statute provides in pertinent part:

Upon proper showing [of indigency], the chief judge shall appoint or direct the magistrate to appoint an attorney to conduct the accused's examination and to conduct the accused's defense. The attorney appointed by the court shall be entitled to receive from the county treasurer, on the certificate of the chief judge that the services

[16] Shapiro, *The enigma of the lawyer's duty to serve*, 55 NYU L R 735 (1980); *State ex rel Scott v Roper*, 688 SW2d 757, 760-767 (Mo, 1985) (en banc).

[17] See, e.g., *Arnold v Kemp*, 306 Ark 294, 302; 813 SW2d 770 (1991) (stating that "the practice of criminal law has changed, as have the times"), (*After Remand*), aff'd sub nom *Arkansas v Independence Co*, 312 Ark 472; 850 SW2d 842 (1993).

[18] See, e.g., *Jewell v Maynard*, 383 SE2d 536 (W Va, 1989), *Delisio v Alaska Superior Court*, 740 P2d 437 (Alas, 1987), and *State ex rel Stephan v Smith*, 242 Kan 336; 747 P2d 816 (1987) (rejecting the traditional view that free indigent defense services is an enforceable obligation of the respective states' bars).

[19] MCL 775.16; MSA 28.1253.

have been rendered, the amount which the chief
judge considers to be reasonable compensation for
the services performed. [MCL 775.16; MSA
28.1253.]

The issue in this case is whether the present fixed-
fee system operates to provide assigned counsel
"reasonable compensation for the services per-
formed" within the meaning of the statute. The
petitioners advance two arguments in support of
their position that it does not: A) the level of
compensation is unreasonably low, and B) the
fixed-fee system of compensation is unreasonable
per se because it fails to differentiate between
attorney effort and fees paid.

A

1

The respondents would have us interpret "rea-
sonable compensation" as that "amount necessary
to secure a sufficient number of able counsel to
adequately represent the indigent accused." The
respondents assert that such an interpretation "is
consistent with the legislative obligation to provide
adequate representation" to indigent criminal de-
fendants. We reject this definition of "reasonable
compensation" because it erroneously assumes
that the statutory purpose underlying assigned
counsels' right to reasonable compensation was to
assure that indigent criminal defendants received
effective assistance of counsel.

Appointed counsel had a statutory right to rea-
sonable compensation for services provided to
criminal indigent defendants long before indigent
criminal defendants had a right, statutory or oth-

erwise, to appointed counsel.[20] The original attorney compensation statute, 1857 PA 109, provided in pertinent part:

> That *an attorney* appointed by a court to defend a person indicted for any offence on account of such person being unable to procure counsel, *shall be entitled to receive* from the county treasury . . . *one of the following fees:* For defending in a case of murder, twenty-five dollars; in case of other felonies, ten dollars; in case of misdemeanors, five dollars. [Emphasis added.]

Rather than granting *indigent defendants* the right to court-appointed counsel, the statute granted *appointed counsel* the right to receive compensation for providing criminal defense services to the indigent.

The Legislature amended the statute in 1893 to delete the fixed-fee provisions, providing instead

---

[20] While an accused had the statutory right "to be heard by counsel" as early as 1846, 1846 RS, ch 151, § 1, now MCL 763.1; MSA 28.854, that right was determined to be "only declaratory of the right [first] secured to an accused by" Const 1835, art 1, § 10, *People v Williams,* 225 Mich 133, 137; 195 NW 818 (1923), and retained virtually without change in every constitution thereafter, which provided that "[i]n every criminal prosecution, the accused shall have the right to . . . have the assistance of counsel for his defense." See Const 1850, art 6, § 28, Const 1908, art 2, § 19, and Const 1963, art 1, § 20. In *Williams,* this Court interpreted the constitutional language as not securing an accused a right to the appointment of counsel. Specifically, this Court stated:

> The State Constitution, art 2, § 19, secures to an accused the right "to have counsel for his defense." This does not mean he shall have counsel at public expense. It is a guaranty of right to employ and have counsel; a right not always recognized in early English criminal cases. [*Williams, supra,* p 137.]

See also *Betts v Brady,* 316 US 455, 469; 62 S Ct 1252; 86 L Ed 1595 (1942), overruled by *Gideon v Wainwright,* 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963), citing *People v Dudley,* 173 Mich 389; 138 NW 1044 (1912); *Williams, supra; People v Harris,* 266 Mich 317; 253 NW 312 (1934); *People v Crandell,* 270 Mich 124; 258 NW 224 (1935), for the proposition that criminal indigent defendants had no right to appointed counsel in Michigan.

that appointed counsel had the right to "reasonable compensation for the services performed," not to exceed fifty dollars in any case. 1893 PA 96.[21] Although the statute was amended two additional times,[22] it continued to provide that *if* an attorney was appointed to represent an indigent criminal defendant, *then* that attorney was entitled to at least *some* compensation. *People v Williams*, 255 Mich 133; 195 NW 818 (1923); *People v Harris*, 266 Mich 317, 318; 253 NW 312 (1934). Indeed, it was not until the enactment of 1957 PA 256 that the statute was amended to provide in mandatory terms for the appointment of counsel for indigents facing criminal charges.[23] By this time, however, appointed counsel had enjoyed the statutory right

---

[21] 1893 PA 96 provided in pertinent part:

Whenever any person charged with having committed any felony or misdemeanor shall be unable to procure counsel *and* the presiding judge shall appoint some attorney to conduct the defense, *the attorney so appointed shall be entitled to receive* from the county treasurer . . . such an amount as the presiding judge shall in his discretion deem *reasonable compensation for the services performed:* Provided, That the compensation allowed in any one case shall not exceed the sum of fifty dollars. [Emphasis added.]

[22] In 1911, the statute was amended to increase the maximum appointed counsel compensation rate from fifty dollars to two hundred fifty dollars for murder cases and one hundred dollars in all other cases. 1911 PA 23. The statute was again amended in 1927 when the Legislature consolidated various criminal procedural statutes into the Code of Criminal Procedure. It was this amendment that removed any reference to statutory maximum rates and authorized judicial determination of "reasonable compensation for the services performed." 1927 PA 175. Despite these amendments, however, the statute remained worded in a manner not suggesting that the legislation was enacted to grant a right to indigents for appointed counsel.

[23] The statute as amended by 1957 PA 256 provided in pertinent part:

Whenever any person charged with having committed any felony or misdemeanor shall be unable to procure counsel . . . the presiding judge *shall* appoint some attorney to conduct the . . . defense and the attorney so appointed *shall be entitled to receive* from the county treasurer . . . such an

to "reasonable compensation for the services performed" in the defense of criminal indigent defendants, unlimited by any statutory maximum rate, for thirty years.[24]

Our task, of course, is to ascertain and give effect to the intent of the Legislature. *Storey v Meijer, Inc,* 431 Mich 368, 376; 429 NW2d 169 (1988). Because appointed counsel's statutory right to compensation existed before indigent criminal defendants had a right to appointed counsel, it is doubtful that the legislative purpose underlying the attorney compensation provision of MCL 775.16; MSA 28.1253 was a desire to assure that an adequate number of able attorneys were available to effectuate the indigent defendant's right to appointed counsel.

"In ascertaining the intent of the lawmakers, where the language of a statute is of doubtful meaning, we may examine the conditions and circumstances surrounding its enactment." *State Treasurer v Wilson,* 423 Mich 138, 144; 377 NW2d 703 (1985). In this regard, we note that there is no indication that the original legislation, or any subsequent amendment of the statute, was motivated by a belief that the failure to provide compensation to appointed counsel made it either difficult for indigent criminal defendants to obtain legal representation or that indigent criminal defendants were receiving ineffective representation.

---

amount as the presiding judge shall in his discretion deem *reasonable compensation for the services performed.*

[24] See n 22.

In 1963, the United States Supreme Court decided *Gideon,* n 20 *supra,* which held the Sixth Amendment right to counsel applicable to the states via the Fourteenth Amendment Due Process Clause. Although MCL 775.16; MSA 28.1253 was twice amended after *Gideon,* 1963 PA 132; 1980 PA 506, the portion of the statute, concerning assigned counsel's right to "reasonable compensation for the services performed," remained, in all essential respects, unchanged.

Indeed, this Court has refused to find that attorneys would shirk their professional obligations to provide competent and diligent legal representation to any client, regardless of pay. *In re Meizlish,* 387 Mich 228, 240; 196 NW2d 129 (1972). The Legislature is presumed to know the law in effect at the time of its enactments. *Malcolm v East Detroit,* 437 Mich 132, 139; 468 NW2d 479 (1991). Thus, we must reject respondents' contention that the legislative purpose underlying the statute's attorney compensation provision was to fulfill the state's obligation to provide adequate representation to indigent criminal defendants.

2

The petitioners would have us define "reasonable compensation" as the amount privately retained counsel would earn for providing similar services for members of the general public. We refuse to do so. When MCL 775.16; MSA 28.1253 was enacted, counsel was provided without costs to indigent criminal defendants by lawyers as part of their professional obligations assumed upon admission to practice law in this state. Our review of the statute's legislative history leads us to conclude that the impetus underlying the enactment and subsequent amendments of MCL 775.16; MSA 28.1253 was the Legislature's desire to relieve members of the bar of at least *some* of their professional obligation to provide free legal services to the indigent.

Iowa gives appointed counsel the statutory right to compensation equal to the current market rate. The Iowa Legislature amended its attorney compensation statute to provide that court-appointed counsel were entitled to reasonable "compensation to be made on the basis of ordinary and customary

charges for like services in the community . . . ."
Iowa Code 815.7; *Hulse v Van Wifvat,* 306 NW2d
707, 711 (Iowa, 1981) (construing the statute as
amended to equate "reasonable compensation"
with "full compensation"). Although our Legisla-
ture easily could have provided a similar definition
for "reasonable compensation," it has not done
so.[25]

3

Representation of indigent criminal defendants
in the Third Circuit Court and the Detroit Record-
er's Court is completely voluntary. Therefore, un-
like the courts of other states that have considered
an involuntarily appointed attorney's right to com-
pensation,[26] we decline, at this time, to establish

[25] While a chief judge certainly could elect to pay assigned counsel
the current market rate for similar legal services, the refusal to pay
such rates is not necessarily violative of MCL 775.16; MSA 28.1253.

[26] See, e.g., *Arnold,* n 17 *supra,* p 305 (involuntarily appointed
counsel was entitled to "just" compensation, considering "the experi-
ence and ability of the attorney, the time and labor required to
perform the legal service properly, the novelty and difficulty of the
issues involved, the fee customarily charged in the locality for similar
legal services, the time limitations imposed upon the client's defense
or by the circumstances, and the likelihood, if apparent to the court,
that the acceptance of the particular employment will preclude other
employment by the lawyer"), *(After Remand),* aff 'd sub nom *Indepen-
dence Co, supra,* p 480 (interpreting "just" compensation as being
neither "confiscatory [n]or unreasonable" and may be less than an
"attorney would expect to receive from a paying client"); *State v
Lynch,* 796 P2d 1150, 1161 (Okla, 1990) (involuntarily appointed
counsel entitled to reasonable overhead and out-of-pocket expenses
plus an hourly rate "tied to the salary range paid to assistant district
attorneys and the district attorneys" within the state, depending "on
the attorney's qualifications"); *White v Bd of Co Comm'rs,* 537 So 2d
1376, 1379 (Fla, 1989) (involuntarily appointed counsel was entitled
only to a statutorily set fee except in extraordinary and unusual cases
where appointed counsel was entitled to "the local prevailing hourly
rate for indigent cases"); *Jewell,* n 18 *supra,* pp 546-547 (involuntarily
appointed counsel was entitled to "at least $45 per hour for out-of-
court work and $65 per hour for in-court work"); *Delisio,* n 18 *supra,*
p 443 (involuntarily appointed counsel was entitled to compensation
equal to that obtainable for such services "by the average competent

any specific definition or formula for determining
or calculating "reasonable compensation." In the
proper exercise of its legislative authority, the
Legislature has "directed the chief judge[s] of the
circuit court to appoint an attorney to represent
an indigent defendant's defense, and directed the
county to pay" whatever a chief judge
"considers . . . reasonable compensation for the
services performed." *Frederick v Presque Isle Co
Circuit Judge,* 439 Mich 1, 15; 476 NW2d 142
(1991). There are fifty-six circuits plus the Detroit
Recorder's Court in our state spread throughout
eighty-three counties of varying financial means.[27]
Attorney population likewise varies from county to
county. Indeed, there is a potential myriad of local
considerations that will necessarily enter into the
chief judge's determination of "reasonable compen-
sation." Thus, what constitutes reasonable com-
pensation may necessarily vary among circuits.

B

1

The petitioners also argue that the present fee
system "is *per se* unreasonable, in that there is no
relationship between the amount of work per-

attorney operating on the open market"); *State ex rel Stephan,* n 18
*supra,* p 383 (involuntarily appointed counsel was entitled to compen-
sation "at a rate which is not confiscatory, considering overhead and
expenses"); *Smith v State,* 118 NH 764, 770; 394 A2d 834 (1978)
(involuntarily appointed counsel was entitled to whatever compensa-
tion the trial court might fix, which should "neither unjustly enrich
nor . . . unduly impoverish the court-appointed attorney"); *State v
Rush,* 46 NJ 399, 413; 217 A2d 441 (1966) (involuntarily appointed
counsel was entitled to "60% of the fee a client of ordinary means
would pay an attorney of modest financial success").

[27] Although we find that county budgetary concerns are appropriate
considerations in the determination of "reasonable compensation,"
such considerations should seldom, if ever, be controlling. The coun-
ties have a duty to fund whatever the chief judge, in the exercise of
sound discretion, deems appropriate.

formed and the amount of fee to be paid to the attorney." To determine whether "reasonable compensation" requires some relationship between services performed and the amount of compensation actually paid, we must again look to the statute. MCL 775.16; MSA 28.1253 provides in pertinent part:

> *The attorney* appointed by the court *shall be entitled to receive* from the county treasurer, on the certificate of the chief judge that the services have been rendered, the amount which the chief judge considers to be *reasonable compensation for the services performed.* [Emphasis added.]

As previously noted, the purpose of statutory construction is to ascertain and give effect to the intent of the Legislature in enacting this statute. *Storey, supra,* p 376. The terms of the statute are clear and unambiguous. Where the statute is clear and unambiguous, the intent of the Legislature in enacting the statute is to be garnered from the language of the statute itself. *Id.; Achtenberg v East Lansing,* 421 Mich 765, 770; 364 NW2d 277 (1985) (stating that "[w]hen the language of a statute is clear, courts must apply it as written").

Applying these principles, we find that in enacting MCL 775.16; MSA 28.1253, the Legislature clearly intended an individualized determination of reasonable compensation for only then is it assured that "*the* attorney" is being reasonably compensated "*for the services performed.*" *Altman v Meridian Twp,* 439 Mich 623, 635; 487 NW2d 155 (1992) (quoting *Baker v General Motors Corp,* 409 Mich 639, 665; 297 NW2d 387 [1980]) (" 'Every word of a statute should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible' ").

We do not mean to suggest that the statute

requires the mechanical calculation of "reasonable compensation" in every case. Such a construction would be unreasonable given the number of indigent defense assignments in the larger counties of our state. Cf. *Franges v General Motors Corp,* 404 Mich 590, 612; 274 NW2d 392 (1979) ("statutes should be construed to prevent absurdity, hardship, injustice or prejudice to the public interest"). Nor do we interpret the statute to require any specific type of compensation system or that a fixed-fee system could never provide reasonable compensation within the meaning of the statute.[28] We simply hold that, whatever the system or method of compensation utilized, the compensation *actually* paid must be reasonably related to the representational services that the individual attorneys *actually* perform.

Applying the statute as construed, we find that the present fee system systematically fails to provide assigned counsel reasonable compensation within the meaning of MCL 775.16; MSA 28.1253. As previously noted, the fixed-fee system was designed to pay the average fee actually earned under the former event-based fee system for legal services provided to indigent defendants facing a particular maximum sentence. Because the event-based fee system paid assigned counsel for representational tasks actually performed, attorneys whose clients elected to plead guilty early in the judicial process were generally entitled to less compensation than attorneys whose clients either elected to plead guilty later or elected to go to trial.

Averaging actual fees paid under the former system to arrive at a lump-sum payment, that is paid without regard to whether a case is pleaded guilty or goes to a lengthy trial, actually inverts

---

[28] If a fixed-fee system is to be utilized, however, it must not operate to overcompensate some at the expense of others.

the former relationship between representational
tasks performed and fees paid. In other words, the
fixed-fee system creates a situation in which attor-
neys whose clients plead guilty earlier in the
criminal process are relatively overcompensated
for their efforts when compared to the compensa-
tion provided to attorneys whose clients do not. In
our view, neither group of attorneys are receiving
"reasonable compensation" within the meaning of
MCL 775.16; MSA 28.1253. Indeed, this inverse
relationship between effort expended and fees paid
is completely at odds with the statutory require-
ment to pay assigned counsel for the services they
performed. The statute expressly requires the pay-
ment of "reasonable compensation for the services
performed," *no more and no less.*

2

Despite the inverted relationship between effort
expended and fees paid, the respondents argue
that compensation paid under the fixed-fee system
is "directly related to the amount of work a lawyer
is expected to perform given the degree of serious-
ness of the crime." We disagree. A major premise
underlying the respondents' argument is that ac-
tual attorney assignments will allow overall com-
pensation for individual assigned counsel to mirror
the "average" paid under the event-based system.
Stated differently, attorneys receiving multiple as-
signments are expected to receive an appropriate
number of early disposition cases, where the fixed
fee tends to overcompensate assigned counsel, to
"balance" against cases ultimately disposed of
later in the process, where the fixed fee tends to
undercompensate assigned counsel, so that the
total "average" individual assigned counsel com-
pensation would remain virtually the same under
either system.

If this indeed were the case, then we may have
reached a different decision. The record, however,

is completely devoid of evidence indicating the existence of attorney assignment procedures implemented to assure individual attorneys receive the requisite number and type of cases that would provide them with a realistic opportunity to "average" the fees that they would have earned had the fee system remained event-based.[29] Absent such assignment control procedures, there is no assurance whatsoever that the fixed fees operate to reasonably compensate individual assigned counsel for the services they perform.

3

The respondents also argue that the ability of assigned counsel to petition for extraordinary fees provides a realistic mechanism for individual determinations of reasonable assigned counsel compensation. We do not agree. Not only has the procedure proven ineffective to assure that assigned counsel are not *undercompensated* by the fixed fees, it is also ineffective in assuring that assigned counsel are not *overcompensated* by the fixed fees, and thus receiving unreasonable compensation for their services.

The special master found, and the record is replete with testimony suggesting, that undercompensated attorneys are hesitant to petition for extraordinary fees, believing that such requests either would prove futile or perhaps even adversely affect their prospects of receiving future

[29] Unlike those contract systems that are designed to assure assigned counsel a specific number of cases to provide a reasonable opportunity to "average" reasonable compensation for the services performed, the assignment system utilized in the Third Circuit Court and the Detroit Recorder's Court provides no such assurance. The task of assigning cases is rotated on two-week intervals among the various judges. Typically, the only information concerning previous attorney assignments that is available to assigning judges are the actual assignments that they themselves have made. In other words, when assigning judges make assignments, they often do so without regard to the actual type and number of cases that any particular attorney has had from other judges throughout a given year.

assignments.[30] Perhaps even more troubling, however, is the lack of any mechanism designed to assure that assigned counsel are not being overcompensated under the present system. Unless assigned counsel files a petition for extraordinary fees, and includes in the petition an analysis of cases handled during the year, such overpayments go undetected.

Common sense dictates that only those attorneys who are underpaid will ever file a petition for extraordinary fees and bother providing the analysis of cases purportedly required under the administrative order. Overcompensated attorneys simply will either refuse to file petitions for extraordinary fees or file them but fail to provide the required supporting documentation.

V

For superintending control to lie, the petitioners must establish that the respondents have failed to perform a clear legal duty *and* the absence of an adequate legal remedy. MCR 3.302(B); *Frederick, supra,* pp 14-15.

MCL 775.16; MSA 28.1253 imposes a duty on the chief judges of both the Third Circuit Court and the Detroit Recorder's Court to authorize the county treasurer to pay "reasonable compensation for the services performed." Having found that the fixed-fee system currently utilized to establish the rate of assigned counsel compensation systematically fails to assure that individual attorneys are

---

[30] Statistics concerning the number of extraordinary fee petitions filed in the Third Circuit Court during 1989, and the actual payments of such fees, tend to support this testimony. While there were over three thousand indigent criminal defense assignments made in the Third Circuit Court during 1989, there were only twenty-nine petitions for extraordinary fees, of which twenty-three were granted, at least in part, for a total dollar amount of extraordinary fees paid of $11,175. This is approximately 1.6 percent of the total indigent attorney fees paid for that year.

reasonably compensated for the services they perform, it necessarily follows that the chief judges have failed to perform a clear legal duty, which satisfies the first condition of the writ.

We further find that the extraordinary fee mechanism fails to provide an adequate legal remedy to cure the systematic unreasonableness of the current compensation system. Although undercompensated attorneys have the ability to petition the court for extraordinary fees and, if they desire, to appeal any adverse determination all the way to this Court, we find such a remedy inadequate.[31] While the record shows that most of the relatively few applications currently submitted are granted, at least in part, we strongly suspect that such a trend would rapidly change if the number of applications required to assure that each and every attorney is provided reasonable compensation for time and effort were actually filed. Application denials would likely skyrocket, forcing attorneys to appeal. And even if attorneys were routinely granted relief on appeal, all they would have to look forward to is another appeal after the next assignment because the underlying problem would remain unchanged. Under such circumstances, the legal remedy is inadequate.[32] Further, there is absolutely no procedure whatsoever that operates to remedy the situation where assigned counsel is unreasonably compensated because of overpayment.

VI

Given the failure to perform a clear legal duty

---

[31] See part IV(B)(3).

[32] Equitable relief is routinely granted to plaintiffs on the basis of inadequacy of legal remedy where they can show that "[t]he defendant acts in such a way that the plaintiff may be required to bring more than one suit to effectuate his legal remedy." Dobbs, Remedies, § 2.5, p 57.

and the absence of an adequate legal remedy, we find that the exercise of this Court's extraordinary power of superintending control is justified in this case. Accordingly, we hereby direct the chief judges of the Third Circuit Court and the Detroit Recorder's Court to discontinue compensating assigned counsel under the fixed-fee system, as it currently exists, for all indigent defense assignments made after December 31, 1993, and to develop for implementation on and after January 1, 1994 a payment system that reasonably compensates assigned counsel for services performed consistent with this opinion. Said plan shall be filed with this Court on or before December 1, 1993.

LEVIN, BRICKLEY, RILEY, GRIFFIN, and MALLETT, JJ., concurred with CAVANAGH, C.J.

BOYLE, J. (*concurring in part and dissenting in part*). Under our authority to administer Michigan's one court of justice, Const 1963, art 6, § 1, I would support a collaborative effort between this Court, the chief judges, and the local funding unit, to discuss and implement changes in the funding system. However, because the chief judge defendants have not violated a clear legal duty, I cannot agree that superintending control is an appropriate remedy. *People v Flint Municipal Judge*, 383 Mich 429; 175 NW2d 750 (1970). MCL 775.16; MSA 28.1253.