# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* Attorney Fees of MITCHELL T. FOSTER.

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DAVID JOHN BERNARD,

       Defendant,

and

MITCHELL T. FOSTER,

       Appellant.

UNPUBLISHED
February 27, 2018

No. 334309
Oakland Circuit Court
LC No. 2015-253430-FH

---

Before: MURRAY, P.J., and FORT HOOD and GLEICHER, JJ.

GLEICHER, J. (*dissenting*).

Attorneys appointed to represent indigent criminal defendants are entitled to be paid a reasonable fee for their work. On this point, the majority and I agree. We part company, however, when it comes to describing the framework that applies to fee requests exceeding a county's schedule. The majority holds that a court properly ranks its own budget as a primary factor in determining a reasonable fee, and may heavily discount a request if the judge retrospectively decides that work done by an attorney was unnecessary. The majority's framework builds into the equation an implacable conflict of interest, disincentivizes effective advocacy, and punishes attorneys who expend extra effort on a client's behalf. I would remand for a fee hearing governed by the same standards that apply to all other attorney-fee requests, and respectfully dissent.

I

The majority holds that it would be unreasonable to compensate attorney Mitch Foster for many of the hours he invested in the defense of David Bernard, and that Oakland County's

- 1 -

limited resources reserved for appointed counsel reinforce this conclusion.  The record belies the former conclusion, and the law the latter.

David Bernard was charged with three felony counts of embezzlement and faced a fourth habitual sentence enhancement.  Had he been convicted by a jury, Bernard's maximum sentence could have been life in prison.

The underlying offenses arose from Bernard's management of his employer's petty cash account over the course of seven years.  The prosecutor rested the bulk of its preliminary examination proof on the testimony of Rodney Crawford, an expert certified in fraud examination and public accounting who had been retained by Bernard's employer.  Crawford described three methods of embezzlement, two accomplished by electronic transfers. The court admitted his 19-page report and voluminous attached documents.  The amount allegedly embezzled exceeded $300,000.

Bernard's retained counsel withdrew shortly after the preliminary examination, and Judge Rae Lee Chabot appointed attorney Mitch Foster.  Foster recognized that the employer's corporate and financial records held the key to any defense.  Foster also understood that if an examination of the financial and corporate data yielded exculpatory evidence, an expert would have to explain the theory to the jury—the same approach used by the prosecutor at the preliminary exam.  Foster found an expert certified in public accounting and fraud investigation, Gerald Gabriel, and made a pitch for payment before Judge Chabot.  Judge Chabot allocated $12,500 for Gabriel's services based on an hourly rate of $250 and Foster's estimate that Gabriel would need 40 to 60 hours to review the more than 2,000 pages of data produced by the employer.

Foster filed several other motions and participated in various hearings.  He carefully kept track of his time, just like most lawyers do.  His billing record is consistent with those regularly presented to this Court when attorney fees are contested.  Foster bills in six-minute increments, which is typical.  He annotates each billing entry with a line or two of text.  His billing record reflects that he spent 78.7 hours working on Bernard's behalf, for which sought payment at a rate of $45 per hour.

Gabriel prepared a report focusing on whether Bernard was the culprit.  He confirmed that Bernard's employer had indeed sustained large losses.  But Gabriel questioned whether Bernard had access to the accounts from which the money was taken.  Relying on the employer's job descriptions, organizational charts, and the financial records, Gabriel queried whether Bernard (and Bernard alone) had diverted the missing money, and whether Bernard could have stolen as much as the prosecution claimed.  The report pointed out flaws and holes in Crawford's report. Gabriel's work supplied Foster with evidence that could create reasonable doubt.

Bernard entered a no contest plea after Foster worked out a *Cobbs* agreement with the prosecutor.[1]   The trial court sentenced Bernard to a minimum term of six years for each conviction (the low end of the guidelines), with a maximum of 40 years.  In light of the possible minimum and maximum sentences he faced, Bernard did well.  And thanks to Foster's successful

[11] *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

motions to delay the sentencing hearing, Bernard was able to repay the county for most of the cost of the expert.

Judge Chabot granted Foster $500 in attorney fees, $115 more than the county's fee schedule permitted. Foster moved for reconsideration, suggesting that he deserved more and that the court reference the *Wood* factors as a guide for determining a reasonable fee.[2] Under Oakland Circuit Court policy, the chief judge decides whether to award an extraordinary fee. Chief Judge Nanci Grant convened a hearing to consider Foster's request. She invited the Oakland Circuit Court Administrator and the manager of the civil criminal division of the court to attend.

At the hearing, Chief Judge Grant and court personnel frequently referenced the court's budget and its constraints. The court administrator advised that $2.1 million was budgeted that year for payment of appointed counsel. Chief Judge Grant emphasized that this budget would not be refilled when it was depleted. The judge told Foster that even the purchase of a new desk required a "very polite[]" request directed to the board of commissioners, which usually was declined.

Chief Judge Grant later issued a written opinion concluding, "Given the budgetary concerns here, the Court finds that it is appropriate to compensate Mr. Foster an additional $200 for this matter." The opinion repeatedly referenced "budgetary concerns." The chief judge declared that the information supplied by the court administrator "supports that budgetary considerations are heavily considered when setting up the relevant fee schedule;" that "the fee schedule is in place in order to comply with budgetary concerns within Oakland County;" that "[b]udgetary concerns are relevant in a matter such as this;" and reminded that even when an item as mundane as a new desk is sought, requests for funding "are almost always denied."

Foster also failed to persuade Chief Judge Grant that most of his work on Bernard's behalf was necessary. As the majority describes, Chief Judge Grant quibbled with Foster about virtually every aspect of the time for which he billed. She rejected the need for any expert assistance, criticized Foster for not having detailed locations and miles in the travel time in his billing records, and took issue with Foster's claimed time spent on various other professional tasks.[3]

Applying the factors identified in *In re Attorney Fees of Jamnik*, 176 Mich App 827, 831; 440 NW2d 112 (1989), the majority holds that none of these determinations constituted an abuse of discretion. Further, the majority asserts that using the factors typically employed in measuring the reasonableness of a requested attorney fee "in a civil matter" "would make very little sense," because counsel here is appointed rather than retained. According to the majority, the Supreme

_____

[2] *Wood v DAIIE*, 413 Mich 573, 588; 321 NW2d 653 (1982).

[3] Contrary to the majority, Chief Judge Grant did not authorize Gabriel's compensation; Judge Chabot did. Chief Judge Grant expressed only scorn for Gabriel's contribution; she stated in her opinion: "Because it is unclear to this Court why the forensic accountant was necessary in the defense of this matter, it finds that it is not reasonable to compensate Mr. Foster in relation to [the hours he spent working with Gabriel]."

Court's opinion in *In re Recorder's Court Bar Ass'n*, 443 Mich 110, 121; 503 NW2d 885 (1993), compels this conclusion.

I believe that Chief Judge Grant abused her discretion by finding unnecessary most of the work Foster did on Bernard's behalf, and that the *Jamnik* criteria should be abandoned. I interpret *In re Recorders Court Bar Ass'n* differently than does the majority; in my view, it strongly counsels against the budgetary focus approved here. By endorsing a framework preordaining that budgets may prevail over the work invested and the results obtained, the majority stokes conflicts of interest and shrinks the pool of conscientious counsel willing to represent indigent defendants.

II

In civil litigation, whether requested attorney fees are "reasonable" hinges on a calculation of the number of hours invested multiplied by an hourly rate, subject to adjustment based on a court's evaluation of relevant attributes of the lawyer (experience, competence, effort) and the nature of the litigation (complex, novel, issues in question, results obtained). Why should these precepts be discarded when an attorney represents an indigent client in a criminal case? Surely the value of an attorney's services is not diminished because the stakes involved are imprisonment rather than compensation.

That is not to say that the public fisc plays no role in the equation of a reasonable fee for court-appointed counsel—of course it does. Budgetary realities are incorporated in the hourly rate used to calculate scheduled fees. That reality results in a far lower payment baseline than would ever apply in a civil case. Appointed counsel in Oakland County are aware of and accept the reduced fee schedule when they take an assignment. Here, the fee schedule called for Foster to receive $385 for his services.[4] He grounded his extraordinary fee request on the assumption that any additional hours awarded would be reimbursed at an hourly rate of $45.00, the hourly rate paid for appointed criminal appeals.

An appropriate evaluation of Foster's request should begin with a determination of the total number of hours invested in Bernard's defense, multiplied by the hourly rate paid for appointed counsel work in Oakland County. That number should then be adjusted up or down depending on Foster's experience, reputation and ability, the skills he needed to handle the case effectively, the results he obtained, the number of hours he devoted to Bernard and their impact on more lucrative work available at the time, and any other factors regarding the litigation the court deems relevant. These factors derive from *Pirgu v United Services Auto Ass'n*, 499 Mich 269, 281-282; 884 NW2d 257 (2016). Some of the *Pirgu* factors do not apply in appointed counsel cases, such as "whether the fee is fixed or contingent." Other unmentioned factors might

---

[4] Ordinarily, the fee for representing a defendant facing a fourth habitual enhancement is $770. Although the record does not tell us how that number was selected, likely it was the result of a simple calculation: the average number of hours expended in similar cases, times an hourly rate. Foster understood that because he did not represent Bernard at the preliminary examination, he would be entitled to only half that amount.

instead be relevant. The point is that *Pirgu* provides a more equitable and ethically defensible paradigm for assessing a reasonable fee than does *Jamnik.*[5]

*Jamnik*, which underlies the majority's fee framework, arose from an appellate lawyer's fee request. This Court held that three factors "should be considered in determining reasonable compensation:"

> 1. The complexity and difficulty of the case and the time and expense of counsel which can reasonably be justified.

> 2. The trial court's policy as to compensation.

> 3. The minimum standards for indigent criminal appellate defense services promulgated by the Michigan Supreme Court in Administrative Order 1981-7, 412 Mich lxxxiv-xci [the "Standards"]. [*In re Fees of Jamnik*, 176 Mich App at 831.]

Neither the majority nor Chief Judge Grant mentioned the third of these three factors, which is a pity. The appellate standards make an important and particularly apt contribution here. Specifically, Standards 9 and 10 instruct:

> 9. Counsel should assert claims of error which are supported by facts or record, which will benefit the defendant if successful, which possess arguable legal merit, and which should be recognizable by a practitioner familiar with criminal law and procedure who engages in diligent legal research. . . .

> 10. Counsel should not hesitate to assert claims which may be complex, unique, or controversial in nature, such as issues of first impression, challenges to the effectiveness of other defense counsel, or arguments for change in the existing law. [Order No. 1981-7, 412 Mich at lxxxvii-lxxxviii.]

Foster's efforts to construct a legal and factual defense through Gabriel's testimony correspond with these standards.

As did Chief Judge Grant, the majority expresses confusion about "[w]hy a certified public accountant was necessary to address the questions Gabriel addressed[.]" I would answer that as a CPA and a certified expert in financial forensics, Gabriel knows how commercial entities structure their accounting, their bookkeeping, their banking practices, and their financial organization. The latter includes the delegation of responsibilities for various accounting and

---

[5] The majority likens my opinion to judicial heresy, chiding that "it is not our duty" as intermediate appellate court judges to express views about the law that have "not been deemed controlling by any prior published opinion in this state." Dissents suggesting a new, improved legal approach enhance rather than diminish the perception of an independent judiciary. Further, "[T]he dissent is often more than just a plea; it safeguards the integrity of the judicial decision-making process by keeping the majority accountable for the rationale and consequences of its decision." Brennan, Jr., *In Defense of Dissents*, 37 Hastings LJ 427, 430 (1986).

banking tasks. In this case, Gabriel studied the 2,000 pages of data supplied by Bernard's employer, as well as the organizational charts and job descriptions for the people who had access to the specific petty cash account that Bernard was accused of having embezzled. Gabriel traced the checks and ATM transactions allegedly used by Bernard to commit the crime. While Gabriel did not disagree that a large sum had been channeled outside the business, he called into question Bernard's access to the company's funds and his ability to have taken them in the manner alleged by the prosecution. Gabriel pointed out that according to the company's structure and the account access granted to employees, Bernard would not have been capable of taking all the money that the company claimed to have lost.

Bernard's analysis created reasonable doubt. I cannot fathom how this evidence could have been presented but through an expert witness familiar with business accounting, finance, banking and organizational practices.

That background brings us back to the Standards cited above. By retaining Gabriel, Foster established a *factual* defense for Bernard. Foster also put forward a *legal* defense in his motion to quash the bindover, arguing that Gabriel's evidence supported that because Bernard had not been entrusted with any of the employer's money, the prosecution could not prove one of the elements of embezzlement.[6] Citing cases on this specific issue from the United States Supreme Court and the Supreme Court of Nevada, Foster argued that Bernard's employer had never entrusted Bernard with management or control of the petty cash account. Therefore, Foster reasoned, Bernard could not have embezzled the funds. At most, Foster contended, Bernard could be found guilty of larceny.

This argument did not prevail. Nevertheless, I find it not only legitimate, but fully justified by the letter and spirit of the Standards. Indeed, Foster's thoughtful construction of a defense for Bernard represented the highest standards of professional conduct. And although the record does not (and could not) reflect the reasons underlying the prosecutor's agreement to a favorable *Cobbs* plea for a fourth habitual offender, I suspect that Foster's planned defense played a role. Accordingly, and in reliance on the Standards, I would hold that Chief Judge Grant abused her discretion by finding that "it is not reasonable to compensate Mr. Foster" for the 19.6 hours he spent consulting with Gabriel, reviewing the financial documents, and filing the motion to quash.

The remaining two *Jamnik* factors set up the conflict of interest tainting their application. And an objective application of the first of those factors convinces me that Chief Judge Grant abused her discretion in finding Bernard's case neither complex nor difficult.

The first *Jamnik* factor focuses on the "complexity and difficulty" of the case, and reiterates the obvious: that counsel bears the burden of justifying time and expenses. There is nothing inherently objectionable about considering "complexity and difficulty" as part of a reasonable fee calculation. But when budget considerations are equally welcome on the scale, the balance is likely to tilt toward trivializing a case and an attorney's efforts—exactly what

---

[6] MCL 750.174 provides that to prove embezzlement, the prosecutor must establish that the defendant had a "relationship of trust" with the principal, and that the money came into the defendant's hands because of that trust relationship.

occurred here.  Parsimony beats professing that a case was problematic and thereby worthy of extra pay.  In retrospect, hard cases become easy, especially when they are over.  The limited nature of the inquiry—"complexity and difficulty"—encourages a court to downplay the problems presented by a case and to minimize the necessity and value of counsel's work.

The majority opines, "It does not appear that this was a particularly novel or difficult case."  Does that mean that the case was a slam-dunk for the prosecution?  Is the corollary that defense counsel should not be encouraged to investigate, consult experts, or develop legal theories consistent with innocence in cases in which conviction seems likely?  And if the case truly was a slam dunk, why didn't the prosecution take it to trial and argue for a life sentence? To the extent that the first two *Jamnik* factors invite the majority's characterization of the case as easy and routine, they conflict with the third, as well as with the ethical standards governing *all* attorneys, especially MRPC 3.1 ("A lawyer for the defendant in a criminal proceeding . . . may so defend the proceeding as to require that every element of the case be established.").

Moreover, given the evidence compiled by the employer and the employer's expert, this was a difficult case to defend.  Foster was obligated to review more than 2,000 pages of financial data and the preliminary examination testimony given by the prosecution's expert.  A record of this complexity is unusual and, I submit, outside the realm of most criminal prosecutions.  Based on Foster's hard work, his reputation, his willingness to try the case, or a combination of all three, Foster was able to negotiate a pretty good deal for a fourth habitual offender.  By finagling repeated adjournments of the sentencing hearing, Foster also managed to create enough time for his client to repay the county for most of Gabriel's fee.  These acts are above and beyond what was expected or the norm.  I would hold that the chief judge misapplied *Jamnik*'s "complexity and difficulty" factor, and that the case met both criteria.

Like the chief judge, the majority second-guesses and criticizes most of Foster's claimed hours.  According to both, Foster should not have billed for travel, and failed to include enough detail in his travel notations to warrant consideration.  On the other hand, the majority takes Foster to task for submitting a bill reflecting all the time he spent on the case.[7]  The majority observes: "The fee schedule undoubtedly takes into account routine appearances, conversations, and time spent waiting for a case to be called.  These are all ordinary events, incident to the representation of a client, that counsel must expect to occur."  The short-sightedness of this pronouncement is breathtaking.

---

[7] The majority "take[s] great umbrage" with this characterization of its opinion and accuses me of confabulating, but I stand by my statement.  The majority observes that Chief Judge Grant "could not discern why Gabriel was necessary to the case, and refused to award any compensation for time Foster spent working with Gabriel or examining his report."  The majority agrees, opining: "Why a certified public accountant was necessary to address the questions Gabriel addressed is entirely unclear.  It is also unclear why Foster needed to spend nearly 20 hours consulting with Gabriel and reviewing the report in order to understand Gabriel's conclusions that were clearly stated in the six-page report.  We cannot find an abuse of discretion in the trial court's conclusion that the time Foster claimed to have spent consulting with Gabriel and reviewing his report was not reasonably justified."  *Id*.  Judge for yourself, reader, whether the majority criticizes Foster for billing for all of his work.

Attorneys routinely keep track of *all* hours expended on a case. This is done not only because the hours may serve as the billing record for payment purposes, but also because in a case potentially permitting an award of additional fees, the attorney must document the hours spent to establish a baseline. Foster kept track of all of his hours not necessarily so that he could bill for them, but to demonstrate if he chose to do so that he had expended many more hours than anticipated for a simple case. His billing was evidence of the *total* amount of work he did. Had he not kept track of each and every hour, he could never have proven that the amount of time he spent on the case was extraordinary. This seems so basic that it should hardly need saying.[8]

And there is more. In 2016, the Michigan Indigent Defense Commission issued a position paper addressing "Attorney Fees after the Passage of the MIDC Act."[9] The paper specifically decrees that "assigned counsel must document the time spent on each case at the earliest stages of the representation." In counties where counsel is paid by the "event," like Oakland, the commission concedes that hourly billing may not be needed. Nevertheless, the position paper notes, "as litigation progresses [the time factor] may be important to note if seeking additional fees." The paper continues:

> Best practices include recording time spent on the case in the following categories: client visits, court appearances, document review, preparation and research, motions filed, days spent in trial, and "miscellaneous" time spent on a case: reviewing discovery, organizing materials, phone calls, etc. All receipts and all out-of-pock expenses should be preserved as well.

Foster's hourly records represent "best practice" behavior. I cannot join in the majority's condemnation of these efforts.

My observations are not meant to downplay the importance of a court's careful consideration of whether a case and a lawyer's efforts warrant extraordinary fees. Such evaluation is not only necessary; it is routinely performed in *every* case in which an attorney seeks a fee award. My disagreement with the majority concerns the result of that process, which I believe was poisoned by an overpowering preoccupation with the court's budget. Objectively, this case easily meets the first and third *Jamnik* factors. The number of hours that Foster expended combined with the lengthy, detailed financial transaction records and the defendant's extensive criminal record (which included financial crimes) demonstrate that this case was both complex *and* difficult. Foster's efforts were entirely consistent with the third *Jamnik* factor. Only the budgetary considerations remained. Here, those considerations prevailed.

---

[8] The Supreme Court's order in *In re Attorney Fees of Ujlaky*, 498 Mich 890; 869 NW2d 624 (2015), also informs my thinking. The order highlighted that "[a]lthough the expenditure of any amount of time beyond that contemplated by the schedule for the typical case does not, ipso facto, warrant extra fees, spending a significant but reasonable number of hours beyond the norm may." This means that attorneys must keep track of their hours if they seek to prove an extraordinary fee is reasonable.

[9] The MIDC Act was signed by Governor Snyder in July 2013. See MCL 780.981 *et seq*.

An extraordinary fee analysis should not pit a lawyer's appropriate and effective efforts against a court's budget. In language presaging this situation, the Supreme Court has cast disfavor on placing budgetary considerations ahead of all others:

> Although we find that county budgetary concerns are appropriate considerations in the determination of "reasonable compensation," such considerations should seldom, if ever, be controlling. The counties have a duty to fund whatever the chief judge, in the exercise of sound discretion, deems appropriate. [*In re Recorder's Court Bar Ass'n*, 443 Mich at 129 n 27.]

This admonition accompanied the Supreme Court's acknowledgment that "local considerations . . . will necessarily enter into the chief judge's determination of 'reasonable compensation,' " and therefore, "what constitutes reasonable compensation may necessarily vary among circuits." *Id*. at 129. In other words, budgets inform the compensation floor—the rate at which appointed attorneys are paid. Otherwise, the determination must rest on what the attorney does for the client. The Supreme Court emphasized, "We simply hold that, whatever the system or method of compensation utilized, the compensation *actually* paid must be reasonably related to the representational services that the individual attorneys *actually* perform." *Id*. at 131 (emphasis in original).

The priority is reasonable compensation. In *Pirgu*, 499 Mich at 274, the Supreme Court addressed "the proper method for calculating a reasonable attorney fee under MCL 500.3148(1)," a no-fault statute. The Court held that precisely the same approach applies to the determination of a reasonable attorney fee awarded as a case-evaluation sanction under MCR 2.403(O): "The plain language of the statute and the court rule both speak in terms of a reasonable fee." *Id*. at 279. I submit that in appointed counsel cases, too, reasonable fee calculations should begin with a determination of the "reasonable hourly rate customarily charged in the locality for similar services," multiplied by the number of hours expended, to reach a baseline figure." *Id*. at 281. The factors delineated in *Pirgu* should guide the next step: the determination of whether an attorney's work merits an additional fee. Just as in *Pirgu*, the factors should not be considered exclusive. *Id*. at 282.

The representation of indigent criminal defendants is difficult and challenging. It is also a constitutional imperative. A fee framework that respects this critical work and is designed to encourage effective assistance of counsel gives meaning to that imperative. I would remand for a hearing at which the economic interests of a court are not pitted against those of counsel who perform this constitutionally mandated function.


/s/ Elizabeth L. Gleicher